926 A.2d 908

BEDFORD DOWNS MANAGEMENT CORPORATION

v.

STATE HARNESS RACING COMMISSION

Valley View Downs, L.P., Intervenor,

Appeal of State Harness Racing Commission

Bedford Downs Management Corporation

v.

State Harness Racing Commission

Valley View Downs, L.P., Intervenor,

Appeal of Valley View Downs, L.P., Intervenor,

Valley View Downs, L.P., Appellant,

v.

State Harness Racing Commission, Appellee,

Bedford Downs Management Corp., Intervenor.

Nos. 5 MAP 2007, 6 MAP 2007, 7 MAP 2007.

Supreme Court of Pennsylvania.

Argued April 17, 2007.

Decided July 2, 2007.

476

Leonidas Pandeladis, Esq., Jorge Augusto, Esq., Barbara Adams, Esq., Gregory Eugene Dunlap, Esq., Harrisburg, for State Harness Racing Commission.

Frank Gugliotta Salpietro, Esq., Victor Paul Stabile, Esq., Dilworth Paxson, L.L.P., Pittsburgh, for Bedford Downs Management Corporation.

Jason Alan Medure, Esq., for amicus curiae City of New Castle.

Thomas W. Leslie, Esq., William J. Madden, Esq., William J. Madden, P.C., New Castle, for amicus curiae Lawrence County, Mercer County and Mahoning Township.

Ryan Neal Armstrong, Esq., Waynesburg, for amicus curiae Pennsylvania War Veterans Council.

Maureen Murphy McBride, Esq., Lamb McErlane, P.C., John J. Cunningham, Esq., Edward G. Lanza, Esq., Saul Ewing, L.L.P., Michael A. Finio, Esq., Scot Russel Withers, Esq., William H. Lamb, Esq., James C. Sargent, Jr., Esq., West Chester, for Valley View Downs, L.P.

Jorge M. Augusto, Esq., PA Department of Agriculture, Leonidas Pandeladis, Esq., Barbara Adams, Esq., PA Office of General Counsel, Gregory Eugene Dunlap, Esq., Harrisburg, for State Harness Racing Commission.

Thomas W. Leslie, Esq., William J. Madden, Esq., New Castle, for amicus curiae Lawrence County, Mercer County and Mahoning Township.

Maureen Murphy McBride, Esq., Lamb McErlane, P.C., Edward G. Lanza, Esq., Saul Ewing, L.L.P., Michael A. Finio, Esq., John J. Cunningham, IV, Esq., William H. Lamb, Esq., James C. Sargent, Esq., Scot Russel Withers, Esq., West Chester, for Valley View Downs, L.P.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

PER CURIAM.

In this appeal by allowance we review whether the Pennsylvania State Harness Racing Commission ("Commission") abused its discretion in denying two license applications to conduct harness race meetings at which pari-mutuel wagering is permitted. In light of the significant deference that the Commission enjoys in making decisions regarding the granting or denying of harness racing license applications, and for the reasons set forth in greater detail below, we affirm in part and reverse in part the order of the Commonwealth Court, and in doing so, uphold the Commission's denial of both

harness racing license applications. We render our decision, however, without prejudice to the applicants to reapply for a harness racing license and for reconsideration by the Commission, consistent with our opinion today.

The relevant facts and procedural history are as follows. On December 27, 2002, Valley View Downs, LP ("Valley View") filed with the Commission an "Application for a License to Conduct a Harness Horse Race Meeting with Pari–Mutuel Wagering" pursuant to the Race Horse Industry Reform Act, 4 P.S. § 325.101 *et seq.* ("Racing Act"). Valley View's harness racing facility was to be located approximately 35 miles northwest of Pittsburgh in South Beaver Township, Beaver County Pennsylvania.

On April 3, 2003, the Commission announced a new Statement of Policy ("Statement of Policy"), effective May 3, 2003, which applied to pending and new license applications. 7 Pa.Code §§ 133.1–133.7. The Statement of Policy declared, *inter alia,* that the Commission would treat applicants as a comparative group and that the Commission would not be obligated to issue any license despite the fact that a license was available. On May 24, 2003, a notice was published in the Pennsylvania Bulletin establishing a 60–day license application period from May 24, 2003 through July 22, 2003.

Thereafter, on June 9, 2003, Bedford Downs Management Corporation ("Bedford") filed an "Application for a License to Conduct a Harness Horse Race Meeting with Pari–Mutuel Wagering" with the Commission. Bedford's proposed racetrack was to be located approximately three miles east of the Ohio/Pennsylvania border in Mahoning Township, Lawrence County, Pennsylvania.

Approximately one year later, on July 5, 2004, the Governor of Pennsylvania, Edward G. Rendell, signed into law the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act" or "Act 71"). 4 Pa.C.S. §§ 1101–1904. The Gaming Act authorized limited gaming by the installation and operation of slot machines with the intention of, *inter alia,* protecting the public through the regulation and policing of

activities involving gaming; enhancing live horse racing, breeding programs, entertainment and employment; and providing a new source of revenue to the Commonwealth. 4 Pa.C.S. § 1102(1), (2), and (3). Importantly, for purposes of this appeal, under the Gaming Act, a person who has been approved by the Commission to conduct harness horse race meetings could apply to the Pennsylvania Gaming Control Board ("Gaming Control Board") for a license to operate slot machines at a licensed racetrack facility. 4 Pa.C.S. § 1302(a)(3).

The Commission held public comment hearings on the applications. Furthermore, a pre-hearing conference was held on October 12, 2004 and evidentiary hearings were conducted from October 25–27, 2004, and on November 9–12, 2004, November 30, 2004, and February 21, 2005.

After the hearings, Bedford and Valley View filed proposed findings of fact and conclusions of law with supporting briefs. In a supplemental brief to the Commission, Valley View raised allegations regarding Bedford's principals' alleged links to "organized crime." The Commission through its investigative staff conducted further background investigations of individuals and transactions relating to both applicants. On June 24, 2005, the Commission, *sua sponte,* reopened the evidentiary record. While the Commission's investigative staff sought a hearing to present its findings regarding Bedford and Valley View, in lieu of a hearing, the parties entered into certain stipulations and a protective order in light of the sensitive nature of the personal background information presented to the Commission. On September 21, 2005, the Commission approved the stipulations and the official docket and evidentiary record were formally closed.

On November 3, 2005, the Commission issued a unanimous final order denying both applications. Six days later, on November 9, 2005, the Commission issued an Adjudication in support of its earlier order. The Adjudication included 238 Findings of Fact and 21 Conclusions of Law.

Specifically, the Commission denied Valley View's application because: (1) its plan to have patrons and horsemen share one main entrance would not be safe; (2) the tight track radius and increased banking was not safe for horses; (3) its plan for a paddock on the backside of the track would be inconvenient for owners and would prevent the public from being able to see and have access to the horses; and (4) the topography of the land would prevent having a separate gate or entrance on the backside of the track.

The Commission denied Bedford's application because: (1) the deceased grandfather of Bedford's principal owners had conducted business with reputed organized crime figures through the companies that he owned; (2) the deceased grandfather acquired most of the land upon which Bedford planned to build its facility while his companies were dealing with reputed organized crime figures; and (3) although Bedford presented to the Commission a "highly confident" letter from Merrill Lynch, which appeared to evidence adequate financing for the project, the letter did not identify the borrower, the letter required more conditions than Valley View's highly confident letter, and the letter was issued, in substantial part, based on the original involvement of Isle of Capri Casinos, Inc. ("Isle of Capri") and CIBC World Markets ("CIBC"), rather than Merrill Lynch's own review of the Bedford project or of the individuals involved in the project.

On December 1, 2005, Bedford filed a petition for reconsideration with the Commission. On December 8, 2005, Valley View filed a petition for hearing and reconsideration. As the applicants thereafter filed appeals in the Commonwealth Court, the Commission found that it no longer had jurisdiction over the petitions for reconsideration.

On December 9, 2005, Bedford and Valley View filed petitions for review with the Commonwealth Court.[1] A divided *en*

1. On February 17, 2006, Valley View filed an application for special relief with the court, seeking an order remanding the case to the Commission for reconsideration, specifically with regard to Valley View's allegation that one of the members of the Commission was

*banc* Commonwealth Court affirmed the denial of the Valley View license application; however, it vacated the denial of the Bedford license application and remanded that application to the Commission for reconsideration in light of its opinion. *Bedford Downs v. State Harness Racing Commission,* 901 A.2d 1063 (Pa.Cmwlth.2006).

Concerning the Valley View license application, the Commonwealth Court majority, in an opinion authored by Judge Rochelle Friedman, found, *inter alia,* that one main entrance for patrons and horsemen was not in the best interests of racing and this finding was supported by the substantial evidence of record; that the proposed tight track radius and increased banking was not in the best interests of racing and this determination was supported by the substantial evidence of record; that Valley View's proposed backside paddock was not in the best interests of racing and that this finding was supported by the substantial evidence of record; and finally, that the Commission's conclusion that the topography, which prevented Valley View from having a separate backside entrance which was not in the best interests of racing was supported by the substantial evidence of record. *Id.* at 1071–72.

With respect to the Bedford license application, the Commonwealth Court majority concluded that the Commission improperly focused upon the deceased grandfather of the Bedford principals and allegations that he did business with reputed organized crime figures through family-owned companies that still exist. According to the Commonwealth Court majority, the Commission may under the Racing Act refuse to grant a license if the experience, character, or fitness of any officer, director or stockholder is such that his or her participation in horse racing or related activities would be inconsistent with the public interest or with the best interests of racing, 4 P.S. § 325.209(e), but the deceased grandfather was not an officer, director, or stockholder of Bedford; thus, it was error to deny Bedford's application on this ground. Addition-

biased against Valley View. On March 3, 2006, the Commonwealth Court denied Valley View's application.

ally, the Commonwealth Court found that the Commission erred in concluding that the appearance of a connection between organized crime and the ground upon which Bedford proposed to construct the facility was inconsistent with the best interests of racing, reasoning that the law is concerned with the adverse influence of people, not the ground. *Id.* at 1072–73.

Finally, the Commonwealth Court majority addressed three aspects of Bedford's proposed financing. First, it determined that the failure of Merrill Lynch's "highly confident" letter to identify the precise borrower had no effect on Bedford's ability to obtain financing. Second, the majority concluded that the fact that Merrill Lynch's highly confident letter contained more conditions than Valley View's financing letter was inconsequential as there was no finding that Bedford would be unable to meet any of the conditions. Finally, the Commonwealth Court addressed and rejected the Commission's concern that Merrill Lynch based its letter, in substantial part, on the high level of confidence that Merrill Lynch had with Isle of Capri and CIBC, not on its own review of the project or the individuals involved in the project. More specifically, the Commonwealth Court reasoned that the departure of Isle of Capri and CIBC from the project was not due to financial concerns, but rather, was a result of a disagreement over management philosophy. Moreover, the Commonwealth Court found that there was no reason to believe, or substantial evidence to support the proposition, that if Merrill Lynch had reviewed the project and the individuals involved, that it would not have issued its letter. Accordingly, the majority of the Commonwealth Court vacated the Commission's order to the extent that it denied the Bedford application and remanded the case to the Commission for reconsideration in light of its decision. *Id.* at 1073–75.

Judge Robert Simpson filed a concurring and dissenting opinion in which he agreed with the majority regarding the issues involving the denial of Valley View's license application. Judge Simpson, however, dissented from the majority's decision to vacate and remand for further consideration the Bedford license application. Judge Simpson believed that there

was no error on the part of the Commission in considering the public's interest not only in relation to the officers, directors, and stockholders of an applicant, but found it within the Commission's discretion to conclude that the issuance of a license which "embraces a long, unresolved history of land owner involvement with reputed crime figures does not serve the public interest." *Id.* at 1077.

President Judge James Gardner Colins, joined by Judge Bernard McGinley, authored a dissenting opinion. In his opinion, Judge Colins discerned that the Commission's order to deny both license applications should be vacated and both applications should be remanded to the Commission. In the dissenters' view, the denial of Valley View's license application was impermissibly based on track and facilities standards that were not known to the applicant, and was inconsistent with its approval of the same size track in an earlier application filed by Chester Downs & Marina, LLP ("Chester Downs"). *Id.* The denial of Valley View's application appeared to be based less on the criteria set forth in the Racing Act and more on its "subjective evaluation of which applicant(s) will best serve the public interest, convenience, and necessity, an arguably vague standard that leads to the kind of arbitrary decision making that occurred with respect to Valley View's license application." *Id.* Further, according to the dissenters, by remanding one application and not the other, the Commonwealth Court created an impression that it was *de facto* awarding the final harness racing license. Therefore, the dissenters would have remanded both matters to the Commission. *Id.*

On January 19, 2007, our Court granted the Commission's petition for allowance of appeal, 458 MAL 2006, and Valley View's petition for allowance of appeal, 540 MAL 2006, regarding the Commonwealth Court's order reversing the Commission's denial of Bedford's license application. We also granted Valley View's petition for allowance of appeal regarding the Commonwealth Court's order affirming the denial of Valley View's license application. 541 MAL 2006.[2] Our grant of

---

**2.** All three appeals were consolidated for oral argument which was held on April 17, 2007.

allocatur with respect to Valley View's petition was limited to two issues:

Whether the State Harness Racing Commission exceeded its statutory powers, acted in an arbitrary and capricious fashion, and violated a harness racing applicant's due process rights by changing the manner in which the application would be evaluated, based on a Statement of Policy and undisclosed preferences in circumstances where the new procedure treated similarly-situated, simultaneously pending applications differently?

and

Whether the Commission's failure to afford an applicant an opportunity to cure purported deficiencies and/or to address previously undisclosed agency preferences rendered the agency's conduct arbitrary and capricious?

In addressing the issues raised by the parties, we will first discuss the substantive standards to be used in the consideration of harness racing with pari-mutuel wagering licensure and then we will set forth the proper standard and scope of review which governs this appeal. Thereafter, we will turn to the issues relating to the Bedford license application, and finally address the questions raised concerning the Valley View license application.

Pursuant to the Racing Act, passed in 1981, the General Assembly permits and regulates harness racing in the Commonwealth. This includes the issuance of licenses to engage in harness racing with pari-mutuel wagering. The Commission, a departmental administrative commission of the Department of Agriculture, has general jurisdiction over all pari-mutuel harness racing activities in the Commonwealth. The Commission is specifically entrusted with the responsibility to determine the grant or denial of licenses to conduct pari-mutuel harness racing activities. The Racing Act provides that no more than five corporations may be licensed by the Commission to conduct harness racing meetings with pari-mutuel wagering. 4 P.S. § 325.205(b). At the time relevant

to this appeal, only one remaining harness racing license was available.

Section 209 of the Racing Act authorized the Commission to issue a harness racing license if "the public interest, convenience or necessity will be served and a proper case for the issuance of a license is shown...." 4 P.S. § 325.209(a). Additionally, no party disputes that the applicant must show that its application is consistent with the "best interests of racing." *See Man O'War Racing Association v. State Horse Racing Commission,* 433 Pa. 432, 250 A.2d 172 (1969).

Moreover, the Commission may refuse to grant a license for a number of reasons set forth in the statute, including *inter alia:* if the officer, director, member or stockholder of the corporation applying for a license has been convicted of a crime involving moral turpitude; engaged in bookmaking; has been found guilty of fraud or misrepresentation in connection with racing or breeding; or has violated any law of a racing jurisdiction or violated any rule of the Commission. Also, a license may be denied if the experience, character, or fitness of any officer, director or stockholder of any such corporation is such that the participation of the person in horse racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing. 4 P.S. § 325.209(e).[3]

**3.** Likewise, pursuant to the Commission's regulations, the Commission is to consider various factors in engaging in a review of a license application. These regulations, entitled "issuance of license," state in relevant part:

In issuing a license, the Commission will among other things, give consideration to the number of licenses granted; the character, experience and general fitness of the officers, directors, members or stockholders, persons having a beneficial ownership therein; the corporation, if any, owning stock in or which shares in the profits or participates in the management of the affairs of the applicant, or which leases to such applicant the plant where it shall operate; the financial responsibility of the applicant; plant facilities; location of plant; equipment to be used in the plant; the personnel to be employed by applicant; policy plans; the public interest, convenience or necessity and the best interests of racing generally.

58 Pa.Code § 185.16.

■ Consistent with the substantive standards applicable to the review of a license application and the significant discretion that the Commission enjoys with respect to license approval, the standard of review of the Commission's decision to grant or deny a harness racing license is one of great deference. We spoke to the applicable standard as far back as 1969 in *Man O'War* in the similar area of thoroughbred horse racing. In *Man O'War*, we explained that judicial review was "severely limited" and that a decision by the State Horse Racing Commission would only be overturned on appellate review when there was "a clear abuse of discretion." 250 A.2d at 181. The reasoning for this deferential standard of review is equally applicable to the review of harness racing license applications. First, the General Assembly delegated to the Commission exclusively this "important and sensitive" task. *Id.* at 180. Second, decisions regarding the grant or denial of a harness racing license include "balancing many competing interests." *Id.* Thus, the number of "technical and precise factors" that the Commission must evaluate and analyze point to an exercise of discretion with which an appellate court should not unnecessarily interfere. *Id.* Related thereto, the Commission has special "expertise and judgment" in making licensing decisions. *Id.* at 181.

■ Especially in light of the multifaceted-decision making that is part and parcel with the review of racing licenses, it is important to emphasize that an abuse of discretion may not be found simply because an appellate court may have reached a different conclusion and chosen different applicants. That is not the judicial function here. An abuse of discretion is not simply an error of judgment. It requires much more. "[I]f in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record, discretion is abused." *Mielcuszny et ux. v. Rosol,* 317 Pa. 91, 176 A. 236, 237 (1934); *see also Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1046 (2003)(*citing Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409,

658 A.2d 341, 343 (1995)(speaking also in terms of "such lack of support so as to be clearly erroneous")).[4]

With this significantly deferential standard of review in mind, we turn to the challenges regarding the Bedford license application.

■ The Commission first contends that with respect to the Bedford license application, the Commonwealth Court erred by interfering with the authority and responsibility of the Commission to interpret and apply the "best interests of racing" standard in conjunction with the suitability standards set forth in the Gaming Act. Specifically, the Commonwealth Court rejected consideration of the criteria under the Gaming Act in addressing a harness racing application:

> To the extent that the Commission relied on Act 71 in considering the deceased grandfather's business dealings, the Commission erred. The Commission has no authority to act under Act 71. Bedford applied to the Commission for a license to conduct harness racing with pari-mutuel wagering, not a license to offer slot machine gaming at its proposed facility. The licenses, the statutes and the governing agencies are separate and distinct.

*Bedford Downs,* 901 A.2d at 1073 n. 11.

The Commission maintains that it did not act under the authority of the Gaming Act as suggested by the Commonwealth Court. At all times, according to the Commission, it focused solely on the application for a harness racing license and acted solely under the Racing Act. At no time did it consider whether Bedford should receive a gaming license in the event that it were to ultimately apply for one and it did not in any fashion usurp the power or jurisdiction of the Gaming Control Board to determine whether Bedford should receive a license for slot machine gaming at its proposed facility. Rather, the Commission offers that it was only concerned with the best interests of racing. The Commission

4. Finally, our scope of review in these matters is plenary. That is our Court may review the entire record in conducting our appellate review. *Heath v. Workers' Compensation Appeal Board (Pennsylvania Board of Probation and Parole),* 580 Pa. 174, 860 A.2d 25, 29 n.2 (2004).

found it necessary to consider Bedford's likely suitability for licensure under the Gaming Act because that statute inextricably linked harness racing and gaming. The Commission supports its position by pointing to both the purpose of the Gaming Act, including to enhance live horse racing, breeding programs, entertainment, and employment in the Commonwealth, 4 Pa.C.S. § 1102, but also to the connection between the two statutes as evidenced by Section 1302 of the Gaming Act which makes the approval of a horse or harness parimutuel license a condition precedent to eligibility for a Category 1 slot license. 4 Pa.C.S. § 1302(a)(1). While the Commission candidly acknowledges that if it were to rely solely upon the suitability standards set forth in the Gaming Act, that would constitute legal error, the Commission goes on to offer that the provisions of the Gaming Act provided guidance to the Commission and nothing more. Valley View adds that it was incumbent upon the Commission to consider suitability under the Gaming Act as Bedford's project was predicated upon gaming revenues to service debt and fund operations of Bedford's harness racing and gaming operations.

Bedford counters that the Commonwealth Court properly held that each agency is only empowered to act under its own jurisdiction and the Commission may only exercise its decision making authority under the Racing Act. Indeed, according to Bedford, there is no authority for the Commission to expand its jurisdiction to consider suitability or any other factor under the Gaming Act. Therefore, to the extent the Commission decided Bedford's application under the Gaming Act, it committed error.[5]

We agree with the Commonwealth Court's admonition and Bedford's general argument that the Commission has no jurisdiction to determine whether an applicant will be a successful applicant for a gaming slots license under the Gaming Act. Simply stated, the Commission does not have the authority to decide issues within the province of the Gaming Control

5. Bedford also suggests, however, that review would be the same under either the Racing Act or the Gaming Act, as in Bedford's view, there are no inconsistent standards of suitability under either statute.

Board. While as noted above, obtaining a harness racing license under the Racing Act could certainly impact the ability of an applicant to obtain a slots license under the Gaming Act, and thus, the two statutes have some clear relationship—the two are not *necessarily inextricably* linked. Thus, to this extent, we find that the Commission has no jurisdiction to act under the Gaming Act. To the extent that the Commission's adjudication can be interpreted to give it such jurisdiction or to decide issues under the Gaming Act, it is hereby rejected.

This limitation on the Commission's authority and power to grant or deny a license under the Racing Act, however, does not end our analysis—the question with respect to Bedford is more nuanced than a simple determination of whether the Commission has jurisdiction to decide issues under the Gaming Act. As acknowledged by Bedford, it introduced to the Commission a proposal of not only a harness racing facility, but a "racino" that is, a combined racing and gaming facility. Thus, Bedford would require licensure by two separate Commonwealth agencies. Yet, even the requirement of obtaining two licenses to operate such a facility would not in and of itself give the Commission the ability to act under the Gaming Act. In this situation, Bedford does not refute that it made the financing and financial projections for its harness racing facility dependent upon revenue to be generated from the gaming operations at its facility. Thus, the viability of the proposed harness racing facility was linked to its gaming operations.

As the showing of financial viability for the proposed harness racing facility was dependent upon the acquisition of a gaming license, rather than usurp the authority of the Gaming Control Board's jurisdiction under the Gaming Act, we find that the Commission was merely ensuring the financial integrity of Bedford's harness racing proposal and the mere consideration by the Commission of Bedford's general suitability or potentiality as a likely candidate for a license under the Gaming Act in the circumstances of this license application was legitimate and not in error.[6]

6. Furthermore, it would appear that Bedford at least implicitly agreed with such a limited form of consideration of general suitability under

■ The second issue raised by the Commission was whether the Commonwealth Court erroneously substituted its judgment for that of the Commission with respect to the Commission's expertise, judgment, and discretion in matters of credibility and suitability regarding the denial of the Bedford application which the Commission contends is in conflict with the significant discretion enjoyed by the Commission pursuant to our Court's decision in *Man O'War*.

The Commission urges that the General Assembly has vested significant discretion in the Commission because of its expertise and judgment in making decisions regarding the issuance of harness racing licenses. Related thereto, the Commission is the ultimate fact finder and is free to accept or reject the testimony of any witness—in whole or in part. Finally, the Commission offers that it is the applicant that must demonstrate that its request for a license is in the best interests of racing generally. The Commission stresses that based upon these standards, the Commonwealth Court nevertheless disregarded the Commission's expertise and judgment when the Commission concluded that the mere appearance of a connection and involvement of Bedford principals with fami-

the Gaming Act by the Commission during the proceedings below. Specifically, the Hearing Examiner asked whether the parties "agree that the new gaming law should be considered by the Commission as part of its consideration of these three applications?" Counsel for Bedford offered that they had a "middle position" on the extent of consideration of the Gaming Act. "[I]f you take a look at what you have to consider under ... the [Racing Act] ... and you consider what's in the gaming law, there are certainly issues that are in common, which I think can be addressed by both boards without stamping on the other's jurisdiction. For instance, in this case, all of the applicants are proposing a casino, slots with the race track. Now, to sit here an say that this Commission would have to ignore the financial impact of slots on the type of facility or the revenues, or how that would support racing ... would be ridiculous. We would put form over substance.... [C]ertainly I don't want to commit this and carve it in stone. But ... it would seem that to the extent there are issues in the gaming law that must be a part of these applications or these facilities, this Commission, I think, has jurisdiction to consider those without having to, per se, consider the requirements of the new gaming law, and I think that finances is one of them. And certainly, the income to be derived from the gaming license is going to benefit these facilities and the horsemen, at least in some respects." R. 851a–56a.

ly-owned companies with reputed ties to organized crime is inconsistent with the best interests of racing. Furthermore, in the Commission's view, the Commonwealth Court substituted its judgment for that of the Commission regarding the ownership of the land upon which the Bedford track was to be built. Finally, the Commission takes issue with the Commonwealth Court's disregard of its concerns pertaining to Bedford's financing. We will address each of these contentions *seriatim.*

The Commission was concerned that Carmen Ambrosia, the deceased grandfather of Bedford's principals, Carmen Shick, Kenneth Shick, and Kendra Tabak, had financial dealings in the 1980's with organized crime. These dealings were purportedly conducted through family-owned businesses, including Ambrosia Coal and Construction Company and New Castle Lime and Stone Company. These family-owned businesses exist today; the Bedford principals are involved with these entities; and Bedford would potentially look to these businesses for financing. Bedford asserts that the denial of its application on the basis of decades old actions of a deceased patriarch, with which none of the Bedford principals had any involvement was a clear abuse of discretion, and that the Commonwealth Court's decision repudiating such concerns was proper.

We initially determine that to the extent that the Commission's adjudication can be read as denying the Bedford application solely on the basis of the deceased grandfather's ties to organized crime figures, it is hereby rejected. We agree with Bedford that Carmen Ambrosia's alleged ties to organized crime in and of themselves should not be a basis to deny the Bedford license application. Plainly stated, guilt by ancestry, without more, is impermissible under our current system of law. *See NAACP v. Claiborne Hardware Co.,* 459 U.S. 898, 932, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982)("[g]uilt by association is a philosophy alien to the traditions of a free society . . . .").

We find, however, that the situation before us is more complicated than the neat scenario of a grandchild being tainted by the purported sins of the grandfather. The parties do not dispute that an applicant for a harness racing license must demonstrate that its application is consistent with the "best interests of racing." *Man O'War*, 250 A.2d at 180. Furthermore, we agree with the Commonwealth Court when it concluded over twenty years ago that one of the purposes of the Racing Act is to "foster an image of horse racing that would make the image of that 'industry' an irreproachable one, even in the eyes of the skeptical public." *Helad Farms v. State Harness Racing Commission*, 79 Pa.Cmwlth. 314, 470 A.2d 181, 184 (1984). Therefore, we do not quibble with the proposition that the Commission is well within its discretion to consider an applicant's ties to organized crime in determining whether an applicant should be awarded a harness racing license. The difficulty comes, however, in applying these admirable concepts to a particular applicant.

Specifically, the Commission found that Carmen Ambrosia along with his wife acquired most of the property upon which the proposed Bedford facility was to be located. As the Commission found:

What is most troubling and ultimately why this Commission cannot award the pari-mutuel license is that Carmen Ambrosia (now deceased) along with his wife acquired most, if not all of the land upon which Bedford intended to build the proposed facility. As the Commission specifically found, at least two of Ambrosia's companies, Ambrosia Coal and Construction Company and New Castle Lime and Stone Co. were earning money or attempting to earn money by virtue of dealing with organized crime figures. These companies exist today. These are the very same companies whose assets Mr. Shick would tap into for financial assistance in developing the Bedford project. He asserted that his companies have millions of tons of coal and limestone reserves and thousands of acres of real estate. At worst, the accumulation of those reserves or those companies, have direct ties or dealings with members of organized crime. At best,

there is a cloud of doubt as to the suitability of the land and the assets for this project. The assets of these companies as well as the land acquired by Carmen Ambrosia are clearly part of Bedford's project.

Commission Adjudication at 81.

The Commission concluded that, "[t]he mere appearance of connection and involvement of Ambrosia Coal and Construction Co. (and other family-owned companies) with organized crime and the ownership of the ground upon which Bedford intends to construct the project reflects negatively upon the racing industry and is therefore inconsistent with the best interests of racing." Commission Adjudication Conclusion of Law No. 16.

There appears to be, however, a certain tension in the findings and conclusions of the Commission. On one hand, as noted above, the Commission was troubled by the connections between Mr. Ambrosia and his family businesses' ties to organized crime. The businesses are the same as are currently in operation and the entities to which Mr. Shick indicated that he was now involved and to which he could turn for financial assistance in developing the Bedford facility. Yet, the Commission recognized that Mr. Ambrosia was deceased and it made clear that it was not "asserting or implying that Carmen Shick or any of the other principals of Bedford had any direct dealing or ties to members of organized crime." Commission Adjudication at 80. Related thereto, the Commission found that the experience, character and fitness of Bedford's officers, directors, and shareholders was consistent with the public interests, convenience or necessity and would be in the best interests of racing generally. Commission Adjudication, Conclusion of Law 15.

Moreover, it is unclear to what extent the Commission denied the Bedford application on the basis that the actual property on which Bedford was to site the facility was originally acquired by Carmen Ambrosia. Commission Adjudication at 81. The Commonwealth Court opined that the Commission abused its discretion to the extent that it relied upon a

connection between organized crime and "the ground upon which Bedford intends to construct the facility. . . ." *Bedford Downs,* 901 A.2d at 1073. Indeed, the Commonwealth Court admonished the Commission that, "[i]t is absurd to believe that the *ground* upon which the racing facility is built will induce Bedford to violate the racing laws." *Id.* (emphasis original). The Commission refutes that it was basing its determination on the fact that illicit funds were used to purchase the property itself. According to the Commission, Bedford's proposal linked the property to the assets of the family-owned businesses and it properly denied the Bedford application on this basis.

The import of the interplay between a historical connection to organized crime, current connections of an applicant to organized crime, and the effect of past connections on a pending application may not always be clear. We caution that while the Commission may certainly consider ties to organized crime in denying a harness racing license, such ties must be of such a nature as to be directly relevant to a pending application.

We need not, however, definitively resolve whether the Commission erred in its consideration of Carmen Ambrosia's alleged past ties to organized crime and its implications with respect to the current Bedford application. As more fully discussed below, we find that independent of any alleged ties to organized crime, Bedford's financing raised sufficient concerns to uphold the Commission's denial of the racing application on this basis alone.

Specifically, the Commission contends that the Commonwealth Court substituted its judgment for the Commission's regarding concerns pertaining to Bedford's financing. In its adjudication, the Commission determined that it was concerned that Merrill Lynch's "highly confident" letter contained a far greater number of conditions than the highly confident letter issued by Bear Stearns to Valley View. Furthermore, Merrill Lynch's letter indicated that the actual borrower of the funds was not identified. Moreover, the Commission found that Merrill Lynch's highly confident letter was based

substantially on the high level of confidence that Merrill Lynch had with Isle of Capri and CIBC and not on extensive review of the Bedford project itself and the individuals involved in that project.

The Commonwealth Court rejected the Commission's concerns with Bedford's financing. First, the Commonwealth Court reasoned that in its view, the fact that the borrower was not identified "has no effect on Bedford's ability to obtain financing." *Bedford Downs,* 901 A.2d at 1074. Specifically, the Commonwealth Court explained that the individual who drafted the letter explained that the structure of a deal varies by project; sometimes a company will create subsidiary corporations to divide casino operations from horse track operations; and the desire was to have a letter which would encompass the various options.

With respect to the greater number of conditions contained in Merrill Lynch's highly confident letter, the Commonwealth Court opined that the Commission did not make any findings of fact with respect to the conditions that Merrill Lynch imposed upon Bedford and whether Bedford would be unable to meet the conditions. According to the Commonwealth Court, absent some finding that Bedford could not meet the conditions imposed by Merrill Lynch, "there can be no reason for concern about Bedford's ability to finance the project based upon those conditions." *Id.*

Finally, the Commonwealth Court rejected the Commission's concern that Merrill Lynch based its highly confident letter on the high level of confidence Merrill Lynch had with Isle of Capri and CIBC. Specifically, the Commonwealth Court offered that Isle of Capri and CIBC ended their relationship with Bedford due to a failure to reach an agreement over the management of the racino and not due to financing. When negotiations with Isle of Capri failed, Bedford pursued a previous offer of a highly confident letter from Innovation Capital Holding, a gaming transaction consulting business with a relationship with Merrill Lynch. Citing to testimony of record not mentioned by the Commission, the Commonwealth Court asserted that Merrill Lynch did not simply rely on the

previous involvement of Isle of Capri and CIBC, but that Merrill Lynch reviewed the project and the individuals involved in the project prior to issuing its highly confident letter. Therefore, the Commonwealth Court found that the Commission abused its discretion in "questioning, without any valid reason, the 'highly confident' letter issued by Merrill Lynch." *Id.* at 1075.

We agree with the Commission that based upon the broad discretion vested in the Commission coupled with an appellate court's deferential standard of review, the Commonwealth Court erred in rejecting the Commission's concerns regarding Bedford's financing. Specifically, we find that the Commonwealth Court's dismissal of the Commission's reasoning failed to give the Commission's concerns regarding Bedford's financing appropriate effect and failed to recognize the credibility determinations made by the Commission.

Initially, we note that the Commission's reasoning regarding financing cannot be viewed in a vacuum. Indeed, the Commission discussed the context of how Bedford's final financing proposal came into being. Specifically, Bedford filed its application on June 9, 2003 and through the course of the proceedings intended to finance its project in conjunction with an equity investment by Isle of Capri. Isle of Capri possessed a highly confident letter from CIBC. On January 11, 2005, however, Bedford advised the Commission that negotiations with Isle of Capri had ceased but that it was securing another highly confident letter for the financing of the project. On January 17, 2005, Merrill Lynch issued its "highly confident" letter regarding the financing of the Bedford project. In its adjudication, the Commission focused upon certain testimony of Mr. Avid Laurence of Merrill Lynch, who signed the "highly confident" letter. Mr. Laurence indicated that because Isle of Capri had been willing to engage in the deal, and not due to Bedford, it gave them a great deal of confidence and comfort. The Commission also noted that before issuing the highly confident letter, Merrill Lynch did not conduct background checks on the principals of Bedford and was not aware of litigation involving the Shick family.

It is in this context that the Commission properly voiced its concerns regarding the number of conditions in the Merrill Lynch highly confident letter, the lack of the identity of the borrower of the funds, and the Merrill Lynch letter being based, to a substantial part, on confidence with Isle of Capri and CIBC, rather than an extensive review of the Bedford project itself and the individuals involved in that project. Each of these determinations was based to one degree or another on credibility determinations. Incomplete and questionable independent due diligence regarding financing are certainly legitimate reasons to deny an application. This is especially true when financial suitability is a fundamental consideration in awarding a racing license. These determinations were for the Commission to make and not the Commonwealth Court.

Related thereto, the Commonwealth Court failed to understand that the license application process was a comparative review process. Thus, the ultimate question was not solely that considered by the Commonwealth Court, viz., whether Bedford could obtain, and meet financing; rather, the issue centered on the integrity and sufficiency of Bedford's financial resources and in part on how Bedford's financing compared to the other license applicant. While the Commonwealth Court majority may have come to a different conclusion regarding the integrity of Bedford's financing than that reached by the Commission, that is not the appropriate role of appellate review of these matters. In the end, we find that the Commission was well within its discretion to be concerned about the terms and conditions of Bedford's financing and the events surrounding the obtaining of such financing; the Commonwealth Court erred in substituting its own judgment in rejecting the Commission's determination.

Therefore, we conclude, for all of the reasons stated above, that the Commission properly denied the Bedford license application.

We now turn to consider Valley View's challenges to the denial of its license application.

■ Valley View first argues that the Commission's Statement of Policy, and its decision to apply a comparative review process to harness racing applications thereunder, violated Valley View's due process rights. Specifically, Valley View offers two distinct grounds by which it challenges the Statement of Policy. First, Valley View maintains that the Commission's Statement of Policy was not properly promulgated as a regulation or a rule, and thus, is not entitled to the force and effect of law and that the procedures imposed pursuant to the Statement of Policy were in conflict with existing law and regulations. Second, according to Valley View, the Statement of Policy led to unfair and inequitable treatment of similarly situated applicants and placed Valley View on unequal footing with another prior applicant, Chester Downs. In this regard, Valley View asserts that Chester Downs was awarded a license without having to compete against other applicants and that the Chester Downs facility proposed a 5/8 mile track which was acceptable to the Commission, whereas Valley View's application was denied, in part, due to a 5/8 mile track.

In response, the Commission and Bedford first offer that Valley View failed to properly and timely file a challenge to the Commission's Statement of Policy and the comparative review process, including assertions regarding the Chester Downs application. Specifically, the Commission submits, *inter alia,* that Valley View did not make its challenge until it filed a petition for reconsideration. According to the Commission, this was the first time Valley View asserted its due process challenges, and thus, they are waived.

Section 703(a) of the Administrative Agency Law, 2 Pa.C.S. § 703(a), provides that "a party who proceeded before a Commonwealth agency under the terms of a particular statute shall not be precluded from questioning the validity of the statute in the appeal, but such party may not raise upon appeal any other question not raised before the agency...." Likewise, Pennsylvania Rule of Appellate Procedure 1551(a) provides that "[n]o question shall be heard or considered by the court which was not raised before the governmental unit." Pa.R.A.P. 1551(a).

We conclude that Valley View's various challenges to the Commission's Statement of Policy, the comparative process, and the due process challenges based upon the Statement of Policy are waived. The Commission adopted the Statement of Policy on April 3, 2003, which became effective May 3, 2003. Approximately one and one-half years after the adoption of the Statement of Policy, on October 12, 2004, the Commission held the first pre-hearing conference in these matters. Valley View failed to raise any challenge to the Statement of Policy during this pre-hearing conference, at subsequent pre-hearing conferences, in pre-hearing memoranda, during public comment hearings, or during any of the evidentiary hearings regarding Valley View or Bedford. *See* 58 Pa.Code § 185.83(*o*).

Valley View attempts to salvage its challenge to the Statement of Policy by pointing to letters it sent to the Commission on April 7, 2003, May 7, 2003, and May 27, 2003, as well as its petition for reconsideration. The letters, which are attached to Valley View's Brief as Appendix C, merely make a "recommendation" that the policy only apply to new applications, Letter Dated April 7, 2003 Appendix C, Valley View Brief; seek "clarification" regarding the applicability of the Statement of Policy (and suggesting that a comparative assessment should not be conducted with respect to Valley View and that the policy should have been proposed as a formal regulation), Letter Dated May 7, 2003 Appendix C, Valley View Brief; and while purportedly agreeing to proceed under the Statement of Policy, "reserve the right to raise additional arguments about the new 'group consideration' standard included in the Statement of Policy and Procedures for License Application Review." Letter Dated May 27, 2003 Appendix C, Valley View Brief.

We find Valley View's position to be unpersuasive. First, even though the letters were apparently written a year and one-half prior to the commencement of the Valley View hearings on November 4, 2004, they were never introduced into the evidentiary record or into the certified record before the Commission. It must be remembered that the proceedings

concerning both Valley View and Bedford were ones in which hearings were held before a Hearing Examiner, both sides were permitted to participate, object, cross-examine, and to make argument. Proposed findings of fact and conclusions of law were presented by the parties, yet no objection to the Statement of Policy was lodged in any of these proceedings, even though Valley View had the opportunity to make such a challenge. Even assuming, *arguendo* that the letters which are attached to Valley View's brief are properly before us,[7] we find that the mere forwarding of letters to agencies outside of the formal administrative proceedings in which parties are active participants is simply insufficient to preserve an issue on appeal. Thus, we conclude that Valley View's failure to make any formal objection during the proceedings to the framework under which the Commission was clearly operating constitutes waiver of Valley View's various challenges to the Statement of Policy and the comparative review process.

Similarly, Valley View first formally attempted to introduce some of its arguments objecting to the Statement of Policy in its Motion for Reconsideration filed with the Commission after the closing of the record in its proceedings and after issuance of the Commission's Adjudication. As the Commonwealth Court observed, citing *Frankford Hospital v. DPW,* 77 Pa. Cmwlth. 448, 466 A.2d 260 (1983), issues raised for the first time in a reconsideration request, after the agency has issued its adjudication, cannot be regarded as raising the issues while the matter was before the agency. Therefore, we conclude that Valley View waived its various challenges to the Statement of Policy and the comparative review process.[8]

7.  The Commonwealth Court denied a request to permit these letters into the record determining, *inter alia,* that the letters were not part of the docket or raised in any evidentiary hearing. (R.3323a).

8.  One aspect of Valley View's challenge to the Statement of Policy and the comparative review process is worthy of further explication. Valley View argues that the Statement of Policy denied it due process and equal protection because another previous licensee, Chester Downs, with a 5/8 mile harness racing track was granted a license by the Commission to operate a facility in Delaware County. Valley View maintains that because the Chester Downs' track was approved and Valley View proposed the same track length for its facility, the Commis-

Valley View's second challenge is that the Commission failed to afford it an opportunity to cure the defects cited by the Commission as the basis for the denial of its license application. According to Valley View, Bedford was permitted four opportunities to correct defects in its application while it was refused this ability. Finally, Valley View suggests that the Commission should have provided preliminary decision-making before a final decision was rendered, akin to that in the land use arena, and that it should have had the ability to cure any deficiencies in its plan prior to a final adjudication.

The Commonwealth Court determined that the Commission properly considered the plan before it and had no obligation to permit revisions after a final adjudication was rendered. We agree. In the matter *sub judice*, Valley View requests the ability to modify its plan, not during the ongoing pre-adjudication process but after a final adjudication was made. In essence, Valley View wants the Commission to re-open the record to allow it to address and purportedly correct its deficiencies. Valley View offers no authority requiring the

sion engaged in unequal treatment of similarly situated applicants. This contention fails. While viewed in one respect, Valley View could not have known during the proceedings that a 5/8 mile track would not be in the best interests of racing, and thus, could not have raised the approval of the Chester Downs' license as unfair until after the Commission's final adjudication. Yet, at its core, Valley View's challenge is not to the award of a harness racing license to Chester Downs, but rather, is another aspect of the challenge to the comparative review process. As noted above, Valley View failed to object to the Statement of Policy and the comparative review process during the formal proceedings before the Commission, and thus, the issue has been waived. Moreover, Valley View premises its argument on the basis that both it and Chester Downs proposed a 5/8 mile track. Therefore, according to Valley View, because Chester Downs received approval of its license application, the Commission should have approved Valley View's application. The flaw with this assertion is that Chester Downs' application was not considered with other applications. While a 5/8 mile track may have been acceptable at the time, the Commission was well within its broad discretion to reject Valley View's track design at a later time, especially when in comparison to the one mile track proposed by Bedford. Thus, for this reason alone, Valley View's argument with respect to Chester Downs must fail. Furthermore, Valley View ignores the other reasons given by the Commission for its denial of the Valley View application, such as the slope of the track, the single entrance, and the backside paddock, as contrary to the best interests of racing.

Commission to take such a post-final adjudication approach to its decision making. Moreover, Valley View was permitted the opportunity to revise its proposal numerous times over the course of the proceedings prior to the Commission's final adjudication. All proceedings must have a point at which at final decision must be made. Therefore, we reject Valley View's demand for a post-final adjudication opportunity to cure its application.[9]

In conclusion, for the reasons set forth above, the order of the Commonwealth Court is reversed with respect to the Bedford license application and affirmed with respect to the Valley View application. In sum, we uphold the Commission's broad discretion and its denial of both harness racing license applications. Finally, our decision today is rendered without prejudice for Bedford and Valley View to reapply for a harness racing license and for reconsideration of those applications by the Commission consistent with our opinion today.

Justice SAYLOR did not participate in the consideration or decision of this matter.

---

**9.** Furthermore, with respect to Valley View's assertion that Bedford was permitted to correct a defect while it was not, Valley View fails to recognize that Bedford's request to re-open the record took place *prior* to the Commission's final order and adjudication. Valley View's request in this matter came thirty days *after* the Commission's final adjudication. While Valley View claims that given the opportunity to cure its deficiencies, it would have met all of the "now-disclosed" requirements, as noted above, Valley View may take the opportunity to reapply to the Commission, without prejudice, for reconsideration of its application.