In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3388

FTI CONSULTING, INC.,

*Plaintiff-Appellant,*

*v.*

MERIT MANAGEMENT GROUP, LP,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 7670 — **Joan B. Gottschall**, *Judge.*

ARGUED MARCH 30, 2016 — DECIDED JULY 28, 2016

Before WOOD, *Chief Judge,* and POSNER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. This case requires us to examine section 546(e) of the Bankruptcy Code, which provides a safe harbor protecting certain transfers from being undone by the bankruptcy trustee. (We considered a different aspect of that statute in *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013), which focused on what counts as a settlement payment made in connection with a securities contract, questions that

do not arise in our case.) The safe harbor prohibits the trustee from avoiding transfers that are "margin payment[s]" or "settlement payment[s]" "made by or to (or for the benefit of)" certain entities including commodity brokers, securities clearing agencies, and "financial institutions." 11 U.S.C. § 546(e). It also protects transfers "made by or to (or for the benefit of)" the same types of entities "in connection with a securities contract." *Id.*

Ultimately, we find it necessary to answer only one question: whether the section 546(e) safe harbor protects transfers that are simply conducted *through* financial institutions (or the other entities named in section 546(e)), where the entity is neither the debtor nor the transferee but only the conduit. We hold that it does not, and accordingly we reverse the judgment of the district court.

**I**

This question has arisen in the bankruptcy proceeding of Valley View Downs, LP, owner of a Pennsylvania racetrack. In 2003, Valley View Downs was in competition with another racetrack, Bedford Downs, for the last harness-racing license in the state. Both racetracks wanted to operate "racinos"—combination horse track and casinos—and both needed the license to do so. Rather than fight over one license, Valley View and Bedford agreed to combine and conquer: Valley View would acquire all Bedford shares in exchange for $55 million. The exchange of the $55 million for the shares was to take place through Citizens Bank of Pennsylvania, the escrow agent. Valley View borrowed money from Credit Suisse and some other lenders to pay for the shares. After the transfer, Valley View obtained the harness-racing license, but it failed

to secure the needed gambling license. This led it to file for Chapter 11 bankruptcy.

FTI Consulting, Inc., as Trustee of the *In re Centaur, LLC et al.* Litigation Trust, which includes Valley View Downs as one of the debtors, brought this suit against Merit Management Group ("Merit"), a 30% shareholder in Bedford Downs. FTI alleges that Bedford's transfer to Valley View and thence to Merit of approximately $16.5 million (30% of the $55 million), is avoidable under Bankruptcy Code sections 544, 548(a)(1)(b), and 550, and the money is properly part of Valley View's bankruptcy estate and thus the Litigation Trust.

There is no question that the transfer at issue is either a "settlement payment" or a payment made "in connection with a securities contract." Merit maintained that the transfer was "made by or to (or for the benefit of)" an entity named in section 546(e) and therefore protected under the safe harbor. It did not rely on its own status for this argument, because it is undisputed that neither Valley View nor Merit is a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency (the entities named in section 546(e)). Instead, Merit argued eligibility for the safe harbor based on the minor involvement of Citizens Bank and Credit Suisse. The district court agreed with Merit, finding that the transfers were "made by or to" a financial institution because the funds passed *through* Citizens Bank and Credit Suisse. It granted judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) in Merit's favor, thereby preventing FTI from avoiding the transfer and recovering the $16.5 million. FTI appeals.

## II

We review the district court's Rule 12(c) judgment on the pleadings *de novo*. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). There are no contested facts.

## A

In order to resolve this case, we must ascertain the meaning of section 546(e). We begin at the obvious place, with its text:

> [T]he trustee may not avoid a transfer that is a margin payment … or settlement payment … made *by or to* (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made *by or to* (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract … .

(Emphasis added.) It is impossible to say in the abstract what the italicized words, "by or to," mean here. As FTI points out, a postcard sent through the U.S. Postal Service could be said to have been sent "by" the Postal Service or "by" the sender who filled it out. When a person pays her bills using an electronic bank transfer, the funds could be said to be sent "by" the owner of the account or by the bank. Similarly, a transfer through a financial institution as intermediary could reasonably be interpreted as being "made by or to" the financial institution or "made by or to" the entity ultimately receiving the money. The plain language does not clarify whether, under

the statute, the transfer of the $16.5 million was made by Valley View to Merit; by Valley View to Citizens Bank; by Citizens Bank to Credit Suisse; or by Citizens Bank or Credit Suisse to Merit. These multiple plausible interpretations require us to search beyond the statute's plain language. (We reject Merit's argument that FTI has waived the right to argue that the statute is ambiguous; it urged the district court to consider the purpose and context of the statute, which implicitly indicates that the meaning is not immediately clear.)

The phrase "for the benefit of," which was added to the safe harbor in a 2006 amendment, is also ambiguous. It could refer to a transaction made *on behalf of* another entity, or it could mean a transaction made merely *involving* an entity receiving an actual financial or beneficial interest. The latter reading suggests that transactions between parties other than the named entities receiving a financial interest (but related to those entities) are also included in the safe harbor—otherwise the additional parenthetical would be redundant. If the former interpretation is used, FTI's argument that the whole phrase refers only to named entities receiving a financial interest—whether or not that entity received the actual transfer of property—is plausible.

The language of the statute, standing alone, does not point us in one direction or the other. In particular, it is unclear whether the safe harbor was meant to include intermediaries, or if it is limited to what we might think of as the real parties in interest—here, the first and the final party possessing the thing transferred. We therefore turn to the statute's purpose and context for further guidance. See *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)

(courts must interpret a "statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole") (internal quotation marks and citations omitted); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

## B

### 1

Section 546(e) appears in Subchapter III of Chapter 5 of the Bankruptcy Code, which deals with what property is included within the estate. While section 546 covers limitations on a trustee's avoidance powers, other sections—in particular sections 544, 547, and 548—set out types of transfers that a bankruptcy trustee can avoid. Section 550 describes how to recover the funds from transfers that are avoidable. The trustee's avoidance powers serve the broad purpose of ensuring the equitable distribution of a debtor's assets.

Section 544 gives the trustee the power to avoid transfers that would be voidable by a creditor extending credit to the debtor at the commencement of the case, if that creditor had a judicial lien or an unsatisfied execution against the debtor, or by a bona fide purchaser. 11 U.S.C. § 544(a). It allows the trustee to act as such a creditor or bona fide purchaser. *Id*. Section 547 allows the trustee to avoid any transfer of any interest of the debtor "to or for the benefit of a creditor," made within 90 days before the filing (or longer if the creditor was an insider) and the transfer was more than the creditor would otherwise have received. *Id.* § 547(b). Section 548(a) allows

avoidance of transfers done with fraudulent intent and transfers that rendered a debtor insolvent.

FTI argues that because these other Chapter 5 sections establish that only transfers "made by the debtor" prior to the bankruptcy petition are avoidable, transfers "made by" a named entity in section 546(e) ought also to refer to a transfer of property by the debtor. Additionally, FTI argues that because sections 544, 547, and 548 refer to avoidance of transfers to or for the benefit of entities subject to fraudulent-transfer liability, section 546(e)'s safe harbor must refer only to transfers made to a named entity that is a creditor.

We agree with FTI. Chapter 5 creates both a system for avoiding transfers and a safe harbor from avoidance—logically these are two sides of the same coin. It makes sense to understand the safe harbor as applying to the transfers that are eligible for avoidance in the first place.

Merit responds that sections 544, 547, and 548 implicate obligations "incurred by" a debtor, as opposed to transfers "made by" a debtor, and therefore Chapter 5 read as a whole does not support the argument that only transfers made by a debtor that constitute obligations incurred by a debtor are within 546(e)'s safe harbor. We see it differently. If anything, the "incurred by" language in the other sections supports FTI's position. Because the safe harbor is meant to protect covered entities against avoidance where it might occur, the fact that sections 544, 547, and 548 permit avoidance only where the transfer represents an actual obligation means that 546(e) provides a safe harbor only where the debtor has incurred an actual obligation to the covered entity.

Merit also argues that Chapter 5 allows avoidance of transfers other than those made directly by the debtor, because "indirect transfers made by third parties to a creditor on behalf of the debtor may also be avoidable." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 564 (7th Cir. 2001). Therefore, Merit concludes, FTI's "attempt to simplify section 548(a)(1) to avoidance only of 'transfers made by a debtor' is simply not supported." But *Warsco* is irrelevant to FTI's position, as it does not speak to avoiding transfers involving financial intermediaries. The $16.5 million transfer to Merit was not a transfer made on behalf of a debtor by a third party; rather, it was one made by the debtor using a bank as a conduit.

2

Section 548(a)(1) allows a trustee to avoid transfers "of an interest of the debtor in property, or any obligation … incurred by the debtor" within two years of bankruptcy if the debtor made the transfer with either (A) the "actual intent to hinder … or defraud" an entity to which the debtor was indebted, or where (B) the debtor received less money for the transfer than its value, or was insolvent on the date of transfer or became insolvent because of the transfer, or made the transfer to benefit an insider. 11 U.S.C. § 548.

Section 548(c) exempts from avoidance a transferee or obligee that "takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred … to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." *Id.* § 548(c). Section 548(d)(2) adds that a commodity broker or financial institution or other protected entity that receives a margin or settlement payment "takes for value to

the extent of such payment" within the meaning of subsection (c).

FTI points out that section 548(d)(2)'s protections apply only where the defendant in a fraudulent-transfer action is one of the types of entities listed in section 546(e). It reasons that Congress cannot have intended to give an entity not listed under section 548(d)(2)(B) a defense simply because it deposited its funds in a bank account. It is the receipt of the value that gives a fraudulent-transfer defendant the protections of section 548(d)(2)(B), and it should similarly be the receipt of value that gives an entity the safe-harbor protections of 546(e).

Merit responds that 548(c) creates a transferee-specific affirmative defense, unlike section 564(e), which addresses the transfer and not the transferee. But we see no reason to differentiate between the two. Merit's preferred interpretation would be so broad as to render any transfer non-avoidable unless it were done in cold hard cash, and that conflicts with section 548(c)'s good faith exception.

3

FTI also finds support in the charitable-contribution safe harbor found in section 548(a)(2), as well as in section 555's safe harbor from enforcement of the Bankruptcy Code's automatic stay. Section 548(a)(2) shields charitable contributions made "by a natural person" "to a qualified" charity from avoidance by a trustee. FTI contends that the "by" and "to" language in section 548(a)(2) should be read consistently with section 546(e), because doing otherwise would lead to an absurd result: charitable contributions made via wire transfer,

or perhaps even with an old-fashioned paper check, through a bank would be avoidable.

Section 555 allows the same entities as those named in section 546(e), where they are counterparties to a securities contract with the debtor, to enforce an *ipso facto* clause in a securities contract despite the Code's general prohibition on non-debtor counterparties enforcing those clauses. See *id.* §§ 555, 365(e), 362(a). FTI argues that we should read these sections consistently. Because section 555 focuses on the economic substance of the transaction, applying only where the named entity is a counterparty as opposed to a conduit or bank for a counterparty, section 546(e)'s safe harbor should apply in the same manner. We agree with FTI that it is the economic substance of the transaction that matters.

4

Section 550 describes how the trustee is to recover avoidable transfers. The trustee can recover the property or its value from the "initial transferee" or "any immediate or mediate transferee." *Id.* § 550. It protects good faith transferees who did not know of the voidability of the transfer, and "any immediate or mediate good faith transferee of such transferee." *Id.*

Although Section 550 allows recovery from a "mediate" transferee, the question *how* money may be recovered is different from the question *from whom* money may be recovered. Although mediate transferees may be required to return funds to which they are not entitled under the Bankruptcy Code's avoidability provisions, mediate transferees are not eligible for the safe harbor because they lack a financial stake comparable to that of a debtor or a party to whom a debt is

owed. Section 550 also contains a good-faith exception to protect unknowing mediate transferees, and so such transferees should not need the safe harbor.

In *Bonded Financial Services, Inc. v. European American Bank*, we defined "transferee" as an entity with "dominion over the money" or "the right to put the money to one's own purposes." 838 F.2d 890, 893 (7th Cir. 1988). We found that a bank that "acted as a financial intermediary" and "received no benefit" was not a "transferee" within the meaning of Chapter 5 of the Bankruptcy Code. *Id*. Although we did not address the 546(e) safe harbor specifically, we now extend our reasoning in *Bonded* to find that transfers "made by or to (or for the benefit of)" in the context of 546(e) refer to transfers made to "transferees" as defined there. We reject Merit's argument that *Bonded* does not apply because, rather than providing a defense, section 546(e) renders a transfer unavoidable. We see no reason why the unavoidability provisions should be broader than defenses to recovery; if anything, the opposite should be true.

## C

The history of section 546(e) also supports the position we take here, and illustrates why our holding will not give rise to problems in the financial-services markets. Congress first enacted the safe harbor in response to a New York federal district court decision: *Seligson v. New York Produce Exchange*, 394 F. Supp. 125 (S.D.N.Y. 1975). In *Seligson*, the trustee of a commodity broker's bankruptcy estate sued the New York Produce Exchange and the New York Produce Exchange Clearing Association to recover payments the broker made to the Association in connection with cottonseed oil futures, which declined in value drastically. 394 F. Supp. at 126–27. The court

denied summary judgment, finding a triable issue of fact on the questions whether the Association was a "transferee" within the meaning of the Bankruptcy Code's avoidability provisions, and whether the Exchange could be held liable because of its relationship with the Association. *Id*. at 134, 136–37.

Congress responded in 1982 by creating the safe harbor, which enabled financial institutions that were recipients of transfers of the kind that took place in *Seligson* to invoke a safe harbor from avoidance. Pub. L. No. 97-222, § 4, 96 Stat. 235 (1982). Congress later expanded the safe harbor to other types of actors in the securities industry, including financial institutions. See Pub. L. No. 98-353, § 441, 98 Stat. 333 (1984). Nothing it did, however, indicated that the safe harbor applied to those institutions in their capacity as intermediaries. The safe harbor has ample work to do when an entity involved in the commodities trade is a debtor or actual recipient of a transfer, rather than simply a conduit for funds.

Our interpretation is consistent with this understanding of the law. As we explained in *Grede v. FCStone, LLC*, the safe harbor's purpose is to "protect[] the market from systemic risk and allow[] parties in the securities industry to enter into transactions with greater confidence"—to prevent "one large bankruptcy from rippling through the securities industry." 746 F.3d 244, 252 (7th Cir. 2014). Congress's discussion of the 2005 amendments to the Code, passed as part of the Bankruptcy Abuse Prevention and Consumer Protection Act, reemphasized the safe harbor's purpose as reducing "systemic risk in the financial marketplace." H.R. Rep. 109-31(I), at 3, *reprinted in* 2005 U.S.C.C.A.N. 88, 89.

Although we have said that section 546(e) is to be under-
stood broadly, see *Grede*, 746 F.3d at 246 ("[t]he code has a
broad exception from avoidance or clawback … for payments
made to settle securities transactions"), that does not mean
that there are no limits. While Valley View's settlement with
Bedford resembled a leveraged buyout, and in that way
touched on the securities market, neither Valley View nor
Merit were "parties in the securities industry." They are
simply corporations that wanted to exchange money for pri-
vately held stock.

We are not troubled by any potential ripple effect through
the financial markets from returning the funds to FTI. The safe
harbor addresses cases in which the debtor-transferor or
transferee is a financial institution or other named entity. See
H.R. Rep. 97-420, at 1, *reprinted in* 1982 U.S.C.C.A.N. 583 (dis-
cussing the extension of the 546(e) safe harbor to the securities
market to avoid "the insolvency of one commodity or security
firm spreading to other firms and possibl[y] threatening the
collapse of the affected market"). Valley View's bankruptcy
will not trigger bankruptcies of any commodity or securities
firms. Even if Valley View's bankruptcy were to "spread" to
Merit after avoidance of the transfer, there is no evidence that
it would have any impact on Credit Suisse, Citizens Bank, or
any other bank or entity named in section 546(e). Nor are we
persuaded that the repercussions of undoing a deal like this
one outweigh the necessity of the Bankruptcy Code's protec-
tions for creditors. We will not interpret the safe harbor so ex-
pansively that it covers any transaction involving securities
that uses a financial institution or other named entity as a con-
duit for funds.

D

We recognize that we are taking a different position from the one adopted by five of our sister circuits, which have interpreted section 546(e) to include the conduit situation. See *In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013) (finding safe harbor applicable where financial institution was trustee and actual exchange was between two private entities); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 987 (8th Cir. 2009) (finding § 546(e) not limited to public securities transactions, and exempting from avoidance Chapter 11 debtor's payments that were deposited in a national bank in exchange for shareholders' privately-held stock during leveraged buyout, as settlement payments made to financial institution); *In re QSI Holdings, Inc.*, 571 F.3d 545, 551 (6th Cir. 2009) (finding HSBC's role in a leveraged buyout "sufficient to satisfy the requirement that the transfer was made to a financial institution" although it was only the exchange agent); *In re Resorts Int'l, Inc.*, 181 F.3d 505, 516 (3d Cir. 1999) (noting that "the requirement that the 'commodity brokers, forward contract merchants, stockbrokers, financial institutions, and securities clearing agencies' obtain a 'beneficial interest' in the funds they handle … is not explicit in section 546"); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 (10th Cir. 1991) (rejecting Kaiser's argument that "even if the payments were settlement payments, § 546(e) does not protect a settlement payment 'by' a stockbroker, financial institution, or clearing agency, unless that payment is to another participant in the clearance and settlement system and not to an equity security holder").

One circuit, however—the Eleventh—agrees with us. In *Matter of Munford, Inc.*, the Eleventh Circuit found section 546(e) inapplicable to payments made by Munford to

shareholders because financial institutions were involved only as conduits. 98 F.3d 604, 610 (11th Cir. 1996). Merit contends that Congress disapproved *Munford* by passing the 2006 Amendment adding "(or for the benefit of)," see H.R. Rep. 109-648, at 23, *reprinted in* 2006 U.S.C.C.A.N. 1585, 1593, and that Congress was responding to the Eleventh Circuit's language in *Munford* that "[t]he bank never acquired a beneficial interest in either the funds or the shares." 98 F.3d at 610. Merit would interpret the amendment as listing acquiring a beneficial interest as only one way of several to satisfy the requirements (the other way being making or receiving a transfer). The Second Circuit has agreed with this position. See *Quebecor*, 719 F.3d at 100 n.3.

We do not believe that Congress would have jettisoned *Munford*'s rule by such a subtle and circuitous route. Its addition of an alternate way to meet the safe harbor criteria says nothing about the method already in the statute. If Congress had wanted to say that acting as a conduit for a transaction between non-named entities is enough to qualify for the safe harbor, it would have been easy to do that. But it did not.

### III

Because we find that section 546(e) does not provide a safe harbor against avoidance of transfers between non-named entities where a named entity acts as a conduit, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.