(Slip Opinion) OCTOBER TERM, 2017 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MERIT MANAGEMENT GROUP, LP *v.* FTI CONSULTING, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 16–784.   Argued November 6, 2017—Decided February 27, 2018

The Bankruptcy Code allows trustees to set aside and recover certain
transfers for the benefit of the bankruptcy estate, including, as rele-
vant here, certain fraudulent transfers "of an interest of the debtor in
property." 11 U. S. C. §548(a). It also sets out a number of limits on
the exercise of these avoiding powers. Central here is the securities
safe harbor, which, *inter alia*, provides that "the trustee may not
avoid a transfer that is a . . . settlement payment . . . made by or to
(or for the benefit of) a . . . financial institution . . . or that is a trans-
fer made by or to (or for the benefit of) a . . . financial institution . . .
in connection with a securities contract." §546(e).

Valley View Downs, LP, and Bedford Downs Management Corp.
entered into an agreement under which Valley View, if it got the last
harness-racing license in Pennsylvania, would purchase all of Bed-
ford Downs' stock for $55 million. Valley View was granted the li-
cense and arranged for the Cayman Islands branch of Credit Suisse
to wire $55 million to third-party escrow agent Citizens Bank of
Pennsylvania. The Bedford Downs shareholders, including petitioner
Merit Management Group, LP, deposited their stock certificates into
escrow. Citizens Bank disbursed the $55 million over two install-
ments according to the agreement, of which petitioner Merit received
$16.5 million.

Although Valley View secured the harness-racing license, it was
unable to achieve its goal of opening a racetrack casino. Valley View
and its parent company, Centaur, LLC, filed for Chapter 11 bank-
ruptcy. Respondent FTI Consulting, Inc., was appointed to serve as
trustee of the Centaur litigation trust. FTI then sought to avoid the
transfer from Valley View to Merit for the sale of Bedford Downs'

stock, arguing that it was constructively fraudulent under §548(a)(1)(B). Merit contended that the §546(e) safe harbor barred FTI from avoiding the transfer because it was a "settlement payment . . . made by or to (or for the benefit of)" two "financial institutions," Credit Suisse and Citizens Bank. The District Court agreed with Merit, but the Seventh Circuit reversed, holding that §546(e) did not protect transfers in which financial institutions served as mere conduits.

*Held*: The only relevant transfer for purposes of the §546(e) safe harbor is the transfer that the trustee seeks to avoid. Pp. 9–19.

(a) Before a court can determine whether a transfer was "made by or to (or for the benefit of)" a covered entity, it must first identify the relevant transfer to test in that inquiry. Merit posits that the relevant transfer should include not only the Valley-View-to-Merit end-to-end transfer, but also all of its component parts, *i.e.*, the Credit-Suisse-to-Citizens-Bank and the Citizens-Bank-to-Merit transfers. FTI maintains that the only relevant transfer is the transfer that it sought to avoid, specifically, the overarching transfer between Valley View and Merit. Pp. 9–14.

(1) The language of §546(e) and the specific context in which that language is used support the conclusion that the relevant transfer for purposes of the safe-harbor inquiry is the transfer the trustee seeks to avoid. The first clause of the provision—"Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title"—indicates that §546(e) operates as an exception to trustees' avoiding powers granted elsewhere in the Code. The text makes clear that the starting point for the §546(e) inquiry is the expressly listed avoiding powers and, consequently, the transfer that the trustee seeks to avoid in exercising those powers. The last clause—"except under section 548(a)(1)(A) of this title"—also focuses on the transfer that the trustee seeks to avoid. Creating an exception to the exception for §548(a)(1)(A) transfers, the text refers back to a specific type of transfer that falls within the avoiding powers, signaling that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer. This reading is reinforced by the §546 section heading, "Limitations on avoiding powers," and is confirmed by the rest of the statutory text: The provision provides that "the trustee may not avoid" certain transfers, which naturally invites scrutiny of the transfers that "the trustee . . . may avoid," the parallel language used in the avoiding powers provisions. The text further provides that the transfer that is saved from avoidance is one "that *is*" (not one that involves) a securities transaction covered under §546(e). In other words, to qualify for protection under the securities safe harbor, §546(e) provides that the otherwise avoidable

transfer itself be a transfer that meets the safe-harbor criteria. Pp. 11–13.

(2) The statutory structure also supports this reading of §546(e). The Code establishes a system for avoiding transfers as well as a safe harbor from avoidance. It is thus only logical to view the pertinent transfer under §546(e) as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers. In an avoidance action, the trustee must establish that the transfer it seeks to set aside meets the carefully set out criteria under the substantive avoidance provisions of the Code. The defendant in that avoidance action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer. If a trustee properly identifies an avoidable transfer, however, the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with §546(e). Pp. 13–14.

(b) The primary argument Merit advances that is moored in the statutory text—concerning Congress' 2006 addition of the parenthetical "(or for the benefit of)" to §546(e)—is unavailing. Merit contends that Congress meant to abrogate the Eleventh Circuit decision in *In re Munford, Inc.,* 98 F. 3d 604, which held that §546(e) was inapplicable to transfers in which a financial institution acted only as an intermediary. However, Merit points to nothing in the text or legislative history to corroborate its argument. A simpler explanation rooted in the text of the statute and consistent with the interpretation of §546(e) adopted here is that Congress added the "or for the benefit of" language that is common in other substantive avoidance provisions to the §546(e) safe harbor to ensure that the scope of the safe harbor and scope of the avoiding powers matched.

That reading would not, contrary to what Merit contends, render other provisions ineffectual or superfluous. Rather, it gives full effect to the text of §546(e). If the transfer the trustee seeks to avoid was made "by" or "to" a covered entity, then §546(e) will bar avoidance without regard to whether the entity acted only as an intermediary. It will also bar avoidance if the transfer was made "for the benefit of" that entity, even if it was not made "by" or "to" that entity.

Finally, Merit argues that reading the safe harbor so that its application depends on the identity of the investor and the manner in which its investment is held rather than on the general nature of the transaction is incongruous with Congress' purportedly "prophylactic" approach to §546(e). But this argument is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities.

Pp. 14–18.

   (c) Applying this reading of the §546(e) safe harbor to this case
yields a straightforward result.  FTI sought to avoid the Valley-View-
to-Merit transfer.  When determining whether the §546(e) safe har-
bor saves that transfer from avoidance liability, the Court must look
to that overarching transfer to evaluate whether it meets the safe-
harbor criteria.  Because the parties do not contend that either Valley
View or Merit is a covered entity, the transfer falls outside of the
§546(e) safe harbor.  Pp. 18–19.

830 F. 3d 690, affirmed and remanded.

   SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–784

_____

## MERIT MANAGEMENT GROUP, LP, PETITIONER *v.* FTI CONSULTING, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[February 27, 2018]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

To maximize the funds available for, and ensure equity in, the distribution to creditors in a bankruptcy proceeding, the Bankruptcy Code gives a trustee the power to invalidate a limited category of transfers by the debtor or transfers of an interest of the debtor in property. Those powers, referred to as "avoiding powers," are not without limits, however, as the Code sets out a number of exceptions. The operation of one such exception, the securities safe harbor, 11 U. S. C. §546(e), is at issue in this case. Specifically, this Court is asked to determine how the safe harbor operates in the context of a transfer that was executed via one or more transactions, *e.g.,* a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D. If a trustee seeks to avoid the A → D transfer, and the §546(e) safe harbor is invoked as a defense, the question becomes: When determining whether the §546(e) securities safe harbor saves the transfer from avoidance, should courts look to the transfer that the trustee seeks to avoid (*i.e.,* A → D) to determine whether

that transfer meets the safe-harbor criteria, or should courts look also to any component parts of the overarching transfer (*i.e.,* A → B → C → D)?  The Court concludes that the plain meaning of §546(e) dictates that the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid.

## I

## A

Because the §546(e) safe harbor operates as a limit to the general avoiding powers of a bankruptcy trustee,[1] we begin with a review of those powers.  Chapter 5 of the Bankruptcy Code affords bankruptcy trustees the authority to "se[t] aside certain types of transfers . . . and . . . recaptur[e] the value of those avoided transfers for the benefit of the estate."  Tabb §6.2, p. 474.  These avoiding powers "help implement the core principles of bankruptcy."  *Id.,* §6.1, at 468.  For example, some "deter the race of diligence of creditors to dismember the debtor before bankruptcy" and promote "equality of distribution."  *Union Bank* v. *Wolas*, 502 U. S. 151, 162 (1991) (internal quotation marks omitted); see also Tabb §6.2.  Others set aside transfers that "unfairly or improperly deplete . . . assets or . . . dilute the claims against those assets."  5 Collier on Bankruptcy ¶548.01, p. 548–10 (16th ed. 2017); see also Tabb §6.2, at 475 (noting that some avoiding powers are designed "to ensure that the debtor deals fairly with its creditors").

Sections 544 through 553 of the Code outline the cir-

---

[1] Avoiding powers may be exercised by debtors, trustees, or creditors' committees, depending on the circumstances of the case.  See generally C. Tabb, Law of Bankruptcy §6.1 (4th ed. 2016) (Tabb).  Because this case concerns an avoidance action brought by a trustee, we refer throughout to the trustee in discussing the avoiding power and avoidance action.  The resolution of this case is not dependent on the identity of the actor exercising the avoiding power.

cumstances under which a trustee may pursue avoidance. See, *e.g.,* 11 U. S. C. §544(a) (setting out circumstances under which a trustee can avoid unrecorded liens and conveyances); §544(b) (detailing power to avoid based on rights that unsecured creditors have under nonbankruptcy law); §545 (setting out criteria that allow a trustee to avoid a statutory lien); §547 (detailing criteria for avoidance of so-called "preferential transfers"). The particular avoidance provision at issue here is §548(a), which provides that a "trustee may avoid" certain fraudulent transfers "of an interest of the debtor in property." §548(a)(1). Section 548(a)(1)(A) addresses so-called "actually" fraudulent transfers, which are "made . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." Section 548(a)(1)(B) addresses "constructively" fraudulent transfers. See *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 535 (1994). As relevant to this case, the statute defines constructive fraud in part as when a debtor:

> "(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> "(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. 11 U. S. C. §548(a)(1).

If a transfer is avoided, §550 identifies the parties from whom the trustee may recover either the transferred property or the value of that property to return to the bankruptcy estate. Section 550(a) provides, in relevant part, that "to the extent that a transfer is avoided . . . the trustee may recover . . . the property transferred, or, if the court so orders, the value of such property" from "the initial transferee of such transfer or the entity for whose benefit such transfer was made," or from "any immediate or mediate transferee of such initial transferee." §550(a).

### B

The Code sets out a number of limits on the exercise of these avoiding powers. See, *e.g.,* §546(a) (setting statute of limitations for avoidance actions); §§546(c)–(d) (setting certain policy-based exceptions to avoiding powers); §548(a)(2) (setting limit to avoidance of "a charitable contribution to a qualified religious or charitable entity or organization"). Central to this case is the securities safe harbor set forth in §546(e), which provides (as presently codified and in full):

"Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."

The predecessor to this securities safe harbor, formerly codified at 11 U. S. C. §764(c), was enacted in 1978 against the backdrop of a district court decision in a case called *Seligson* v. *New York Produce Exchange*, 394 F. Supp. 125 (SDNY 1975), which involved a transfer by a bankrupt commodity broker. See S. Rep. No. 95–989, pp. 8, 106 (1978); see also Brubaker, Understanding the Scope of the §546(e) Securities Safe Harbor Through the Concept of the

"Transfer" Sought To Be Avoided, 37 Bkrtcy. L. Letter 11–
12 (July 2017). The bankruptcy trustee in *Seligson* filed
suit seeking to avoid over $12 million in margin payments
made by the commodity broker debtor to a clearing associ-
ation on the basis that the transfer was constructively
fraudulent. The clearing association attempted to defend
on the theory that it was a mere "conduit" for the trans-
mission of the margin payments. 394 F. Supp., at 135.
The District Court found, however, triable issues of fact on
that question and denied summary judgment, leaving the
clearing association exposed to the risk of significant
liability. See *id.,* at 135–136. Following that decision,
Congress enacted the §764(c) safe harbor, providing that
"the trustee may not avoid a transfer that is a margin
payment to or deposit with a commodity broker or forward
contract merchant or is a settlement payment made by a
clearing organization." 92 Stat. 2619, codified at 11
U. S. C. §764(c) (repealed 1982).

  Congress amended the securities safe harbor exception
over the years, each time expanding the categories of
covered transfers or entities. In 1982, Congress expanded
the safe harbor to protect margin and settlement pay-
ments "made by or to a commodity broker, forward con-
tract merchant, stockbroker, or securities clearing agency."
§4, 96 Stat. 236, codified at 11 U. S. C. §546(d). Two years
later Congress added "financial institution" to the list of
protected entities. See §461(d), 98 Stat. 377, codified at 11
U. S. C. §546(e).[2] In 2005, Congress again expanded the

––––––––––

  [2] The term "financial institution" is defined as:

  "(A) a Federal reserve bank, or an entity that is a commercial or
savings bank, industrial savings bank, savings and loan association,
trust company, federally-insured credit union, or receiver, liquidating
agent, or conservator for such entity and, when any such Federal
reserve bank, receiver, liquidating agent, conservator or entity is acting
as agent or custodian for a customer (whether or not a 'customer', as
defined in section 741) in connection with a securities contract (as

list of protected entities to include a "financial participant" (defined as an entity conducting certain high-value transactions). See §907(b), 119 Stat. 181–182; 11 U. S. C. §101(22A). And, in 2006, Congress amended the provision to cover transfers made in connection with securities contracts, commodity contracts, and forward contracts. §5(b)(1), 120 Stat. 2697–2698. The 2006 amendment also modified the statute to its current form by adding the new parenthetical phrase "(or for the benefit of)" after "by or to," so that the safe harbor now covers transfers made "by or to (or for the benefit of)" one of the covered entities. *Id.,* at 2697.

C

With this background, we now turn to the facts of this case, which comes to this Court from the world of competitive harness racing (a form of horse racing). Harness racing is a closely regulated industry in Pennsylvania, and the Commonwealth requires a license to operate a racetrack. See *Bedford Downs Management Corp.* v. *State Harness Racing Comm'n*, 592 Pa. 475, 485–487, 926 A. 2d 908, 914–915 (2007) (*per curiam*). The number of available licenses is limited, and in 2003 two companies, Valley View Downs, LP, and Bedford Downs Management Corporation, were in competition for the last harness-racing

———————

defined in section 741) such customer; or

"(B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940." 11 U. S. C. §101(22).

The parties here do not contend that either the debtor or petitioner in this case qualified as a "financial institution" by virtue of its status as a "customer" under §101(22)(A). Petitioner Merit Management Group, LP, discussed this definition only in footnotes and did not argue that it somehow dictates the outcome in this case. See Brief for Petitioner 45, n. 14; Reply Brief 14, n. 6. We therefore do not address what impact, if any, §101(22)(A) would have in the application of the §546(e) safe harbor.

license in Pennsylvania.

Valley View and Bedford Downs needed the harness-racing license to open a "'racino,'" which is a clever moniker for racetrack casino, "a racing facility with slot machines." Brief for Petitioner 8. Both companies were stopped before the finish line, because in 2005 the Pennsylvania State Harness Racing Commission denied both applications. The Pennsylvania Supreme Court upheld those denials in 2007, but allowed the companies to reapply for the license. See *Bedford Downs*, 592 Pa., at 478–479, 926 A. 2d, at 910.

Instead of continuing to compete for the last available harness-racing license, Valley View and Bedford Downs entered into an agreement to resolve their ongoing feud. Under that agreement, Bedford Downs withdrew as a competitor for the harness-racing license, and Valley View was to purchase all of Bedford Downs' stock for $55 million after Valley View obtained the license.[3]

With Bedford Downs out of the race, the Pennsylvania Harness Racing Commission awarded Valley View the last harness-racing license. Valley View proceeded with the corporate acquisition required by the parties' agreement and arranged for the Cayman Islands branch of Credit Suisse to finance the $55 million purchase price as part of a larger $850 million transaction. Credit Suisse wired the $55 million to Citizens Bank of Pennsylvania, which had agreed to serve as the third-party escrow agent for the transaction. The Bedford Downs shareholders, including petitioner Merit Management Group, LP, deposited their stock certificates into escrow as well. At closing, Valley View received the Bedford Downs stock certificates, and in October 2007 Citizens Bank disbursed $47.5 million to the

———————

[3] A separate provision of the agreement providing that Bedford Downs would sell land to Valley View for $20 million is not at issue in this case.

Bedford Downs shareholders, with $7.5 million remaining in escrow at Citizens Bank under the multiyear indemnification holdback period provided for in the parties' agreement. Citizens Bank disbursed that $7.5 million installment to the Bedford Downs shareholders in October 2010, after the holdback period ended. All told, Merit received approximately $16.5 million from the sale of its Bedford Downs stock to Valley View. Notably, the closing statement for the transaction reflected Valley View as the "Buyer," the Bedford Downs shareholders as the "Sellers," and $55 million as the "Purchase Price." App. 30.

In the end, Valley View never got to open its racino. Although it had secured the last harness-racing license, it was unable to secure a separate gaming license for the operation of the slot machines in the time set out in its financing package. Valley View and its parent company, Centaur, LLC, thereafter filed for Chapter 11 bankruptcy. The Bankruptcy Court confirmed a reorganization plan and appointed respondent FTI Consulting, Inc., to serve as trustee of the Centaur litigation trust.

FTI filed suit against Merit in the Northern District of Illinois, seeking to avoid the $16.5 million transfer from Valley View to Merit for the sale of Bedford Downs' stock. The complaint alleged that the transfer was constructively fraudulent under §548(a)(1)(B) of the Code because Valley View was insolvent when it purchased Bedford Downs and "significantly overpaid" for the Bedford Downs stock.[4] Merit moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), contending that the §546(e) safe harbor barred FTI from avoiding the Valley View-to-Merit transfer. According to Merit, the safe harbor ap-

--------

[4] In its complaint, FTI also sought to avoid the transfer under §544(b). See App. 20–21. The District Court did not address the claim, see 541 B. R. 850, 852–853, n. 1 (ND Ill. 2015), and neither did the Court of Appeals for the Seventh Circuit.

plied because the transfer was a "settlement payment . . . made by or to (or for the benefit of)" a covered "financial institution"—here, Credit Suisse and Citizens Bank.

The District Court granted the Rule 12(c) motion, reasoning that the §546(e) safe harbor applied because the financial institutions transferred or received funds in connection with a "settlement payment" or "securities contract." See 541 B. R. 850, 858 (ND Ill. 2015).[5] The Court of Appeals for the Seventh Circuit reversed, holding that the §546(e) safe harbor did not protect transfers in which financial institutions served as mere conduits. See 830 F. 3d 690, 691 (2016). This Court granted certiorari to resolve a conflict among the circuit courts as to the proper application of the §546(e) safe harbor.[6] 581 U. S. \_\_\_ (2017).

## II

The question before this Court is whether the transfer between Valley View and Merit implicates the safe harbor exception because the transfer was "made by or to (or for the benefit of) a . . . financial institution." §546(e). The parties and the lower courts dedicate much of their attention to the definition of the words "by or to (or for the benefit of)" as used in §546(e), and to the question whether

————————

[5] The parties do not ask this Court to determine whether the transaction at issue in this case qualifies as a transfer that is a "settlement payment" or made in connection with a "securities contract" as those terms are used in §546(e), nor is that determination necessary for resolution of the question presented.

[6] Compare *In re Quebecor World (USA) Inc.*, 719 F. 3d 94, 99 (CA2 2013) (finding the safe harbor applicable where covered entity was intermediary); *In re QSI Holdings, Inc.*, 571 F. 3d 545, 551 (CA6 2009) (same); *Contemporary Indus. Corp.* v. *Frost*, 564 F. 3d 981, 987 (CA8 2009) (same); *In re Resorts Int'l, Inc.*, 181 F. 3d 505, 516 (CA3 1999) (same); *In re Kaiser Steel Corp.*, 952 F. 2d 1230, 1240 (CA10 1991) (same), with *In re Munford, Inc.*, 98 F. 3d 604, 610 (CA11 1996) (*per curiam*) (rejecting applicability of safe harbor where covered entity was intermediary).

there is a requirement that the "financial institution" or other covered entity have a beneficial interest in or dominion and control over the transferred property in order to qualify for safe harbor protection. In our view, those inquiries put the proverbial cart before the horse. Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test in that inquiry. At bottom, that is the issue the parties dispute in this case.

On one side, Merit posits that the Court should look not only to the Valley View-to-Merit end-to-end transfer, but also to all its component parts. Here, those component parts include one transaction by Credit Suisse to Citizens Bank (*i.e.,* the transmission of the $16.5 million from Credit Suisse to escrow at Citizens Bank), and two transactions by Citizens Bank to Merit (*i.e.,* the transmission of $16.5 million over two installments by Citizens Bank as escrow agent to Merit). Because those component parts include transactions by and to financial institutions, Merit contends that §546(e) bars avoidance.

FTI, by contrast, maintains that the only relevant transfer for purposes of the §546(e) safe-harbor inquiry is the overarching transfer between Valley View and Merit of $16.5 million for purchase of the stock, which is the transfer that the trustee seeks to avoid under §548(a)(1)(B). Because that transfer was not made by, to, or for the benefit of a financial institution, FTI contends that the safe harbor has no application.

The Court agrees with FTI. The language of §546(e), the specific context in which that language is used, and the broader statutory structure all support the conclusion that the relevant transfer for purposes of the §546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions.

## A

Our analysis begins with the text of §546(e), and we look to both "the language itself [and] the specific context in which that language is used . . . ." *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997). The pertinent language provides:

> "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution . . . or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract . . . , except under section 548(a)(1)(A) of this title."

The very first clause—"Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title"—already begins to answer the question. It indicates that §546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers"). That is, when faced with a transfer that is otherwise avoidable, §546(e) provides a safe harbor notwithstanding that avoiding power. From the outset, therefore, the text makes clear that the starting point for the §546(e) inquiry is the substantive avoiding power under the provisions expressly listed in the "notwithstanding" clause and, consequently, the transfer that the trustee seeks to avoid as an exercise of those powers.

Then again in the very last clause—"except under section 548(a)(1)(A) of this title"—the text reminds us that the focus of the inquiry is the transfer that the trustee seeks to avoid. It does so by creating an exception to the

exception, providing that "the trustee may not avoid a transfer" that meets the covered transaction and entity criteria of the safe harbor, "except" for an actually fraudulent transfer under §548(a)(1)(A). 11 U. S. C. §546(e). By referring back to a specific type of transfer that falls within the avoiding power, Congress signaled that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer.

Reinforcing that reading of the safe-harbor provision, the section heading for §546—within which the securities safe harbor is found—is: "Limitations on avoiding powers." Although section headings cannot limit the plain meaning of a statutory text, see *Florida Dept. of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U. S. 33, 47 (2008), "they supply cues" as to what Congress intended, see *Yates* v. *United States*, 574 U. S. ___, ___ (2015) (slip op., at 10). In this case, the relevant section heading demonstrates the close connection between the transfer that the trustee seeks to avoid and the transfer that is exempted from that avoiding power pursuant to the safe harbor.

The rest of the statutory text confirms what the "notwithstanding" and "except" clauses and the section heading begin to suggest. The safe harbor provides that "the trustee may not avoid" certain transfers. §546(e). Naturally, that text invites scrutiny of the transfers that "the trustee may avoid," the parallel language used in the substantive avoiding powers provisions. See §544(a) (providing that "the trustee . . . may avoid" transfers falling under that provision); §545 (providing that "[t]he trustee may avoid" certain statutory liens); §547(b) (providing that "the trustee may avoid" certain preferential transfers); §548(a)(1) (providing that "[t]he trustee may avoid" certain fraudulent transfers). And if any doubt remained, the language that follows dispels that doubt: The transfer that the "the trustee may not avoid" is specified to be "a transfer that *is*" either a "settlement

payment" or made "in connection with a securities con-
tract." §546(e) (emphasis added). Not a transfer that
involves. Not a transfer that comprises. But a transfer
that is a securities transaction covered under §546(e). The
provision explicitly equates the transfer that the trustee
may otherwise avoid with the transfer that, under the safe
harbor, the trustee may not avoid. In other words, to
qualify for protection under the securities safe harbor,
§546(e) provides that the otherwise avoidable transfer
itself be a transfer that meets the safe-harbor criteria.

Thus, the statutory language and the context in which it
is used all point to the transfer that the trustee seeks to
avoid as the relevant transfer for consideration of the
§546(e) safe-harbor criteria.

B

The statutory structure also reinforces our reading of
§546(e). See *Hall* v. *United States*, 566 U. S. 506, 516
(2012) (looking to statutory structure in interpreting the
Bankruptcy Code). As the Seventh Circuit aptly put it,
the Code "creates both a system for avoiding transfers and
a safe harbor from avoidance—logically these are two
sides of the same coin." 830 F. 3d, at 694; see also *Fidelity
Financial Services, Inc.* v. *Fink*, 522 U. S. 211, 217 (1998)
("Section 546 of the Code puts certain limits on the avoid-
ance powers set forth elsewhere"). Given that structure, it
is only logical to view the pertinent transfer under §546(e)
as the same transfer that the trustee seeks to avoid pur-
suant to one of its avoiding powers.

As noted in Part I–A, *supra*, the substantive avoidance
provisions in Chapter 5 of the Code set out in detail the
criteria that must be met for a transfer to fall within the
ambit of the avoiding powers. These provisions, as Merit
admits, "focus mostly on the characteristics of the transfer
that may be avoided." Brief for Petitioner 28. The trustee,
charged with exercising those avoiding powers, must

establish to the satisfaction of a court that the transfer it seeks to set aside meets the characteristics set out under the substantive avoidance provisions. Thus, the trustee is not free to define the transfer that it seeks to avoid in any way it chooses. Instead, that transfer is necessarily defined by the carefully set out criteria in the Code. As FTI itself recognizes, its power as trustee to define the transfer is not absolute because "the transfer identified must satisfy the terms of the avoidance provision the trustee invokes." Brief for Respondent 23.

Accordingly, after a trustee files an avoidance action identifying the transfer it seeks to set aside, a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer. If a trustee properly identifies an avoidable transfer, however, the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with §546(e), see Part II–A, *supra.*

In the instant case, FTI identified the purchase of Bedford Downs' stock by Valley View from Merit as the transfer that it sought to avoid. Merit does not contend that FTI improperly identified the Valley View-to-Merit transfer as the transfer to be avoided, focusing instead on whether FTI can "ignore" the component parts at the safe-harbor inquiry. Absent that argument, however, the Credit Suisse and Citizens Bank component parts are simply irrelevant to the analysis under §546(e). The focus must remain on the transfer the trustee sought to avoid.

## III
### A

The primary argument Merit advances that is moored in the statutory text concerns the 2006 addition of the paren-

thetical "(or for the benefit of)" to §546(e). Merit contends that in adding the phrase "or for the benefit of" to the requirement that a transfer be "made by or to" a protected entity, Congress meant to abrogate the 1998 decision of the Court of Appeals for the Eleventh Circuit in *In re Munford, Inc.*, 98 F. 3d 604, 610 (1996) (*per curiam*), which held that the §546(e) safe harbor was inapplicable to transfers in which a financial institution acted only as an intermediary. Congress abrogated *Munford*, Merit reasons, by use of the disjunctive "or," so that even if a beneficial interest, *i.e.,* a transfer "for the benefit of" a financial institution or other covered entity, is sufficient to trigger safe harbor protection, it is not necessary for the financial institution to have a beneficial interest in the transfer for the safe harbor to apply. Merit thus argues that a transaction "by or to" a financial institution such as Credit Suisse or Citizens Bank would meet the requirements of §546(e), even if the financial institution is acting as an intermediary without a beneficial interest in the transfer.

Merit points to nothing in the text or legislative history that corroborates the proposition that Congress sought to overrule *Munford* in its 2006 amendment. There is a simpler explanation for Congress' addition of this language that is rooted in the text of the statute as a whole and consistent with the interpretation of §546(e) the Court adopts. A number of the substantive avoidance provisions include that language, thus giving a trustee the power to avoid a transfer that was made to "or for the benefit of" certain actors. See §547(b)(1) (avoiding power with respect to preferential transfers "to or for the benefit of a creditor"); §548(a)(1) (avoiding power with respect to certain fraudulent transfers "including any transfer to or for the benefit of an insider . . . "). By adding the same language to the §546(e) safe harbor, Congress ensured that the scope of the safe harbor matched the scope of the

avoiding powers. For example, a trustee seeking to avoid a preferential transfer under §547 that was made "for the benefit of a creditor," where that creditor is a covered entity under §546(e), cannot now escape application of the §546(e) safe harbor just because the transfer was not "made by or to" that entity.

Nothing in the amendment therefore changed the focus of the §546(e) safe-harbor inquiry on the transfer that is otherwise avoidable under the substantive avoiding powers. If anything, by tracking language already included in the substantive avoidance provisions, the amendment reinforces the connection between the inquiry under §546(e) and the otherwise avoidable transfer that the trustee seeks to set aside.

Merit next attempts to bolster its reading of the safe harbor by reference to the inclusion of securities clearing agencies as covered entities under §546(e). Because a securities clearing agency is defined as, *inter alia*, an intermediary in payments or deliveries made in connection with securities transactions, see 15 U. S. C. §78c(23)(A) and 11 U. S. C. §101(48) (defining "securities clearing agency" by reference to the Securities Exchange Act of 1934), Merit argues that the §546(e) safe harbor must be read to protect intermediaries without reference to any beneficial interest in the transfer. The contrary interpretation, Merit contends, "would run afoul of the canon disfavoring an interpretation of a statute that renders a provision ineffectual or superfluous." Brief for Petitioner 25.

Putting aside the question whether a securities clearing agency always acts as an intermediary without a beneficial interest in a challenged transfer—a question that the District Court in *Seligson* found presented triable issues of fact in that case—the reading of the statute the Court adopts here does not yield any superfluity. Reading §546(e) to provide that the relevant transfer for purposes

of the safe harbor is the transfer that the trustee seeks to avoid under a substantive avoiding power, the question then becomes whether that transfer was "made by or to (or for the benefit of)" a covered entity, including a securities clearing agency. If the transfer that the trustee seeks to avoid was made "by" or "to" a securities clearing agency (as it was in *Seligson*), then §546(e) will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary. The safe harbor will, in addition, bar avoidance if the transfer was made "for the benefit of" that securities clearing agency, even if it was not made "by" or "to" that entity. This reading gives full effect to the text of §546(e).

B

In a final attempt to support its proposed interpretation of §546(e), Merit turns to what it perceives was Congress' purpose in enacting the safe harbor. Specifically, Merit contends that the broad language of §546(e) shows that Congress took a "comprehensive approach to securities and commodities transactions" that "was prophylactic, not surgical," and meant to "advanc[e] the interests of parties in the finality of transactions." Brief for Petitioner 41–43. Given that purported broad purpose, it would be incongruous, according to Merit, to read the safe harbor such that its application "would depend on the identity of the investor and the manner in which it held its investment" rather than "the nature of the transaction generally." *Id.,* at 33. Moreover, Merit posits that Congress' concern was plainly broader than the risk that is posed by the imposition of avoidance liability on a securities industry entity because Congress provided a safe harbor not only for transactions "to" those entities (thus protecting the entities from direct financial liability), but also "by" these entities to non-covered entities. See Reply Brief 10–14. And, according to Merit, "[t]here is no reason to believe that Congress was

troubled by the possibility that transfers *by* an industry hub could be unwound but yet was unconcerned about trustees' pursuit of transfers made *through* industry hubs." *Id.,* at 12–13 (emphasis in original).

Even if this were the type of case in which the Court would consider statutory purpose, see, *e.g., Watson* v. *Philip Morris Cos.,* 551 U. S. 142, 150–152 (2007), here Merit fails to support its purposivist arguments. In fact, its perceived purpose is actually contradicted by the plain language of the safe harbor. Because, of course, here we do have a good reason to believe that Congress was concerned about transfers "*by* an industry hub" specifically: The safe harbor saves from avoidance certain securities transactions "made by or to (or for the benefit of)" covered entities. See §546(e). Transfers "through" a covered entity, conversely, appear nowhere in the statute. And although Merit complains that, absent its reading of the safe harbor, protection will turn "on the identity of the investor and the manner in which it held its investment," that is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities.

For these reasons, we need not deviate from the plain meaning of the language used in §546(e).

## IV

For the reasons stated, we conclude that the relevant transfer for purposes of the §546(e) safe harbor is the same transfer that the trustee seeks to avoid pursuant to its substantive avoiding powers. Applying that understanding of the safe-harbor provision to this case yields a straightforward result. FTI, the trustee, sought to avoid the $16.5 million Valley View-to-Merit transfer. FTI did not seek to avoid the component transactions by which that overarching transfer was executed. As such, when determining whether the §546(e) safe harbor saves the

transfer from avoidance liability, *i.e.,* whether it was "made by or to (or for the benefit of) a . . . financial institution," the Court must look to the overarching transfer from Valley View to Merit to evaluate whether it meets the safe-harbor criteria. Because the parties do not contend that either Valley View or Merit is a "financial institution" or other covered entity, the transfer falls outside of the §546(e) safe harbor. The judgment of the Seventh Circuit is therefore affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*