# United States Court of Appeals
## For the First Circuit
_____

No. 20-2041

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Highways and Transportation
Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, as Representative for the Puerto Rico Electric
Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, as Representative for the Puerto Rico
Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Public Buildings Authority,

Debtors.

_____

UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO (UTIER);
SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGIA
ELECTRICA (SREAEE),

Interested Parties, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, as representative
for the Puerto Rico Electric Power Authority (PREPA),

Debtor, Appellee,

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

Movant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain, U.S. District Judge[*]]

———————————————

Before

Howard, Chief Judge,
Lynch and Kayatta, Circuit Judges.

———————————————

Jessica E. Méndez Colberg, with whom Rolando Emmanuelli Jiménez and Bufete Emmanuelli, C.S.P. were on brief, for appellants.

Martin J. Bienenstock, with whom Timothy W. Mungovan, John E. Roberts, Mark D. Harris, Ehud Barak, Margaret A. Dale, Daniel Desatnik, Shiloh A. Rainwater, Paul V. Possinger, Joseph S. Hartunian, and Proskauer Rose LLP were on brief, for appellee Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Electric Power Authority.

Peter Friedman, with whom John J. Rapisardi, Elizabeth L. McKeen, Ashley M. Pavel, and O'Melveny & Myers LLP were on brief, for appellee the Puerto Rico Fiscal Agency and Financial Advisory Authority.

———————————————

August 12, 2021

———————————————

———————————————

[*]     Of the Southern District of New York, sitting by designation.

**LYNCH**, **Circuit Judge**.  The Puerto Rico Electric Power Authority ("PREPA") is one of the largest public power utilities in the United States and is the only electrical energy distributor in Puerto Rico.  PREPA has suffered catastrophic failures to provide power to the citizens of Puerto Rico, causing great hardship.  In 2016, in response to the government debt crisis affecting Puerto Rico and its instrumentalities like PREPA, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), and the president signed the bill into law.  See 48 U.S.C. §§ 2101-2241.  Among other things, PROMESA created the Financial Oversight and Management Board for Puerto Rico ("FOMB").  Id. § 2121.  In 2017, FOMB, appellee here in several capacities, filed for bankruptcy on behalf of PREPA.  Three years later, in 2020, PREPA entered a contract with LUMA Energy, LLC and LUMA Energy ServCo, LLC (collectively, "LUMA"), a private consortium, to transfer the operations and management of PREPA to LUMA.

This particular appeal concerns whether the PROMESA Title III court committed any legal error in allowing certain expenses incurred by PREPA under this contract as entitled to administrative expense priority pursuant to § 503(b)(1)(A) of the Bankruptcy Code.  See In re Fin. Oversight & Mgmt. Bd. for P.R. ("Administrative Expense Order"), 621 B.R. 289, 303 (D.P.R. 2020).  We find no error and affirm.

## I. Facts and Procedural History

Puerto Rico created PREPA to provide reliable electric power to the Commonwealth. See P.R. Laws Ann. tit. 22, §§ 193, 196. In 2016, the president signed into law PROMESA, which Congress passed in response to the government debt crisis in Puerto Rico. 48 U.S.C §§ 2101-2241. Title III of PROMESA made many sections of the Bankruptcy Code applicable in restructuring proceedings for Puerto Rico and its instrumentalities. See id. §§ 2161-2177.

In July 2017, after PREPA became unable to service its debt, FOMB began restructuring proceedings on its behalf, overseen by the Title III court. See In re Fin. Oversight & Mgmt. Bd. for P.R. (In re PREPA), 899 F.3d 13, 18 (1st Cir. 2018). This triggered an automatic stay of pre-petition creditors' claims against PREPA. See 11 U.S.C. § 362(a); 48 U.S.C. § 2161(a) (incorporating the automatic stay provision).

Appellants Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") and Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE") are pre-petition creditors whose claims were stayed when PREPA's restructuring proceedings began. UTIER is a labor union representing PREPA workers, and SREAEE is a private trust created pursuant to a collective bargaining agreement between PREPA and UTIER. As of

- 4 -

June 2020, PREPA owes SREAEE approximately $3.8 billion in unfunded pension obligations.

In June 2018, Puerto Rico passed the Puerto Rico Electric Power System Transformation Act to partially privatize PREPA. P.R. Laws Ann. tit. 22, §§ 1111-1125. Puerto Rico's Public-Private Partnerships Authority ("P3 Authority"), a public corporation, then began a competitive bidding process to find a private entity to assume control over PREPA's power transmission and distribution system ("T&D System").

Two years later, in June 2020, PREPA and the P3 Authority entered a contract ("T&D Contract") with LUMA Energy to gradually transfer operations and management of PREPA to LUMA. The T&D Contract included a front-end transition plan. That plan is divided into three phrases: assess, analyze, and act. Each phase detailed tasks and services LUMA agreed to provide to PREPA to facilitate its operational takeover. These services included reviewing PREPA's performance data (assess), identifying root causes of performance issues and the requirements for reengineering PREPA's business processes (analyze), and conducting a cost-benefit analysis of proposed solutions to PREPA's problems (act). PREPA agreed to pay LUMA the costs of performing these front-end transition services, which are estimated to amount to $76 million, as well as a $60 million flat fee (the "Front-End

- 5 -

Transition Service Fee").[1]  PREPA also agreed to pay any late fees that might become due as a result of its untimely payments.  PREPA agreed to "file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by [PREPA] . . . during the Front-End Transition Period, including the Front-End Transition Service Fee."  See 11 U.S.C. § 503(b)(1)(A).  If the Title III court refused to grant the motion, LUMA could terminate the T&D Contract. On July 7, 2020, PREPA, FOMB, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), PREPA's fiscal agent under Puerto Rico law, moved before the Title III court for entry of the order.  UTIER, SREAEE, and other parties opposed the motion.

In October 2020, the Title III court granted the motion in part and denied it in part.  See Administrative Expense Order, 621 B.R. at 303.  After holding that the motion was ripe for review, the Title III court addressed the objectors' argument that operating expenses like the Front-End Transition Service Fee cannot be given administrative expense priority under § 503(b)(1)(A) of the Bankruptcy Code.  The objectors argued that § 503(b)(1)(A) gives priority to "necessary costs and expenses of preserving the estate."  Id. at 298 (quoting 11 U.S.C.

---

[1]     The exact fee is calculated according to a formula in the T&D Contract.

- 6 -

§ 503(b)(1)(A)). They argued this section cannot apply on its own terms because there is no "estate" in Title III proceedings. Id.

The Title III court rejected that argument. Id. at 299. It held that "the text and structure of PROMESA compel the conclusion that operating expenses of PREPA are eligible for administrative expense priority." Id. In so holding, the Title III court reasoned that the fact that Congress incorporated § 503 of the Bankruptcy Code in its entirety through PROMESA "provides a strong indication that Congress did not intend to preclude the applicability of section 503(b)(1)(A) in the Title III context." Id. Further, it stated that "there is no conceptual basis for excluding expenses relating to the preservation of property of a debtor in Title III debt adjustment proceedings from treatment as administrative expenses." Id. The Title III court ruled that the cases cited by the objectors were "not controlling and . . . unpersuasive." Id. at 300.

The Title III court then determined that AAFAF, PREPA, and FOMB "have satisfied their burden of demonstrating that the Front-End Transition Obligations other than any Late Fees associated therewith . . . are, to the extent incurred and payable under the T&D Contract, reasonable and necessary expenses of preserving PREPA" and granted the motion in part. Id. at 303. As to the late fees, it denied the motion in part without prejudice "solely to the extent that it seeks an allowed administrative

expense claim for any amounts that might become due . . . as a result of PREPA's untimely payment of any Front-End Transition Obligations."  Id. at 302.

The Title III court declined to address the objectors' argument that granting the motion "would contravene subsections 201(b)(1)(B) and 201(b)(1)(C) of PROMESA."  Id. at 303 n.12.  The subsections require fiscal plans to "ensure the funding of essential public services" and "provide adequate funding for public pension systems."  Id. (quoting 48 U.S.C. § 2141(b)(1)(B), (C)).  FOMB certified a fiscal plan and budget for PREPA that include the Front-End Transition Service Fee, and the Title III court held that it lacked jurisdiction under 48 U.S.C. § 2126(e) to decide the objectors' challenge to that certification decision. Id.

UTIER and SREAEE timely appealed.

## II. Analysis

We review the Title III court's legal conclusions de novo.  See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 (2014); In re Fin. Oversight & Mgmt. Bd. for P.R. (Díaz Mayoral v. Fin. Oversight & Mgmt. Bd. for P.R.), 998 F.3d 35, 40 (1st Cir. 2021).  We review the court's application of the law to the facts for abuse of discretion.  See Highmark, 572 U.S. at 563; In re Francis, 996 F.3d 10, 16 (1st Cir. 2021); In re Energy Future Holdings Corp. (NextEra Energy, Inc. v. Elliott

Assocs., L.P.), 904 F.3d 298, 314 (3d Cir. 2018) ("Exercising . . . discretion and taking into account all of the relevant circumstances, the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is 'actually necessary to preserve the value of the estate.'" (quoting 11 U.S.C. § 503(b)(1)(A))).

A. Section 503(b)(1)(A) of the Bankruptcy Code Applies in Title III Cases, Contrary to Appellants' Arguments.

We consider first the text of Title III of PROMESA in determining whether § 503(b)(1)(A) of the Bankruptcy Code applies in Title III cases. See Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 893 (2018); Woo v. Spackman, 988 F.3d 47, 50-51 (1st Cir. 2021). Section 503(b) of the Bankruptcy Code allows for administrative expenses in bankruptcy proceedings, including "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Congress incorporated numerous provisions of the Bankruptcy Code into Title III of PROMESA, including § 503 in its entirety. See 48 U.S.C. § 2161(a). Title III of PROMESA further directs that "property of the estate," when used in an incorporated provision of the Bankruptcy Code, means "property of the debtor." Id. § 2161(c)(5).

Appellants argue that § 503(b)(1)(A) of the Bankruptcy Code cannot apply to Title III cases because there is no "estate"

in Title III proceedings.  See In re Fin. Oversight & Mgmt. Bd. for P.R. (Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 340, 349 (1st Cir. 2019).[2]  Appellants further argue that 48 U.S.C. § 2161(c)(5) does not apply to § 503(b)(1)(A) of the Bankruptcy Code because § 503(b)(1)(A) uses the terminology "estate" rather than "property of the estate."

These arguments fail because of the text and structure of Title III and the Bankruptcy Code.  Like § 503(b)(1)(A), other incorporated Bankruptcy Code provisions use the term "estate" notwithstanding the absence of an estate in Title III proceedings.  See, e.g., 11 U.S.C. § 365(i)(2)(A) ("rights against the estate"); id. § 365(k) ("relieves the trustee and the estate from any liability"); id. § 502(e)(1)(A) ("such creditor's claim against the estate is disallowed"); id. § 507(a)(2) ("fees and charges assessed against the estate"); id. § 510(c)(2) ("such a subordinated claim be transferred to the estate"); id. § 550(a)

---

[2]    In support of their position, appellants cite to one case and two treatises that discuss the applicability of § 503(b)(1)(A) to the Chapter 9 municipal bankruptcy context.  See In re New York City Off-Track Betting Corp., 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010); 6 Collier on Bankruptcy ¶ 901.04 (16th ed. 2021); 5 Norton Bankruptcy Law and Practice 3d § 90:14.  These authorities are not binding on us and do not address the unique circumstances of Title III proceedings.  The opinion in Off-Track Betting Corp. also does not address that Chapter 9, like Title III, directs that "property of the estate" means "property of the debtor" when used in an incorporated provision of the Bankruptcy Code.  See 11 U.S.C. § 902(1).  We need not explore whether Off-Track Betting Corp. was correctly decided because its analysis in the Chapter 9 context is not applicable to the Title III context.

- 10 -

("for the benefit of the estate"); id. § 551 (same); id. § 557(c)(2)(F) ("orderly administration of the estate"); see also 48 U.S.C. § 2161(a) (incorporating the foregoing provisions of the Bankruptcy Code into Title III of PROMESA).

Courts interpret statutes to "give effect, if possible, to every word Congress used," Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 632 (2018) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)), and to reject "interpretation[s] of the statute that would render an entire subparagraph meaningless." Id. Under appellants' interpretation, these statutory provisions would be rendered meaningless in Title III proceedings despite Congress's explicit decision to incorporate the provisions into PROMESA. We do not believe Congress so intended.

Congress chose to incorporate the entirety of § 503 into PROMESA, even though it could have elected to incorporate only certain provisions of that section as it had done with other sections of the Bankruptcy Code. See, e.g., 48 U.S.C. § 2161(a) (incorporating into PROMESA subsections 364(c), 364(d), 364(e), and 364(f) of the Bankruptcy Code, but not other provisions in § 364). As a result, each provision in § 503, including § 503(b)(1)(A), must be given effect. See City of Providence v. Barr, 954 F.3d 23, 37 (1st Cir. 2020). That is strengthened further by the fact that PROMESA specifically incorporates § 507(a)(2), and no other provision of § 507, which grants priority

- 11 -

status to administrative expenses under § 503(b), a provision which only concerns the "estate." The failure to substitute the term "estate" as used in § 503(b)(1)(A) with "property of the debtor" would render both it and § 507(a)(2) meaningless in the PROMESA context.

There is another reason why reading "estate" in the context of § 503(b)(1)(A) to mean "property of the debtor" is sensible in light of the text and structure of Title III and the Bankruptcy Code. Section 541 of the Bankruptcy Code defines "estate" as "property of the estate," which includes "property of the debtor." See 11 U.S.C. § 541; see also Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 978 (2017) (noting that "[f]iling for Chapter 11 bankruptcy" creates "an estate . . . comprising all property of the debtor" (citing 11 U.S.C. § 541(a))). Although Title III does not incorporate § 541, see 48 U.S.C. § 2161(a), it states that "[a] term used in a section of [the Bankruptcy Code]" that was "made applicable in a [Title III] case" is supplied with "the meaning given to the term for the purpose of the applicable section, unless the term is otherwise defined in [Title III]." Id. § 2161(b). The "meaning given to" the term "estate" for "the purpose" of § 503(b)(1)(A) is the meaning given to it under § 541, which is "property of the estate." "Property of the estate" is "otherwise defined" in Title III to mean "property of the debtor,"

- 12 -

and so we can reasonably understand "estate" in the context of § 503(b)(1)(A) to mean "property of the debtor."

To the extent there is any ambiguity in the statutory text, the historical context and legislative purpose of PROMESA's enactment further support our conclusion. See Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1749 (2020); In re Weinstein, 272 F.3d 39, 48 (1st Cir. 2001) ("After holding the text of the Bankruptcy Code ambiguous . . . we have considered inferences to be drawn from the text of the statute, its historical context, its legislative history, and the underlying policies that animate its provisions.").

Congress enacted PROMESA in response to a "fiscal emergency in Puerto Rico," resulting in the Commonwealth being "unable to provide its citizens with effective services." 48 U.S.C. § 2194(m)(1)-(2). Among its purposes, PROMESA "provide[s] the Government of Puerto Rico with the resources and the tools it needs to address an immediate existing and imminent crisis." Id. § 2194(n)(1). One such tool is § 507(a)(2) of the Bankruptcy Code, which Congress incorporated into Title III of PROMESA. Id. § 2161(a). Section 507(a)(2) grants priority to administrative expenses under § 503(b). Without an assurance of priority, third parties, like LUMA, entering contracts with Puerto Rico's instrumentalities, like PREPA, have no guarantee their claims to payment will be paid. Indeed, it is unlikely that any post-

- 13 -

petition third party would contract with Puerto Rico's instrumentalities or risk default on their obligations. Congress surely did not intend PROMESA's provisions to be ineffective.

B. The Title III Court Did Not Abuse Its Discretion in Applying the Requirements of § 503(b)(1)(A).

We next review whether the Title III court abused its discretion in finding that the front-end transition services satisfied the requirements of § 503(b)(1)(A). Administrative Expense Order, 621 B.R. at 303. A request for administrative expense treatment under § 503(b) may qualify if "(1) the right to payment arose from a postpetition transaction with the debtor estate, . . . and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor" or, in this case, PREPA. In re Hemingway Transp., Inc., 954 F.2d 1, 5 (1st Cir. 1992).

The Title III court permissibly credited the declaration of Omar J. Marrero ("Marrero Declaration"), submitted by appellees, in finding that the front-end transition services were beneficial to PREPA. Administrative Expense Order, 621 B.R. at 301.[3] The Marrero Declaration stated that many aspects of the front-end transition services were necessary prerequisites to LUMA

---

[3] Appellants did not provide any contrary factual evidence that the front-end transition services do not benefit PREPA. To the extent appellants argue that the Title III court's factual findings are clearly erroneous, that argument is frivolous.

- 14 -

assuming control over PREPA's T&D System. These services include "mobilization of the LUMA Energy transition team, transition of management, mobilization of employees and establishment of benefit plans for employees of LUMA Energy, information technology transition and development, development of a system remediation plan and initial operating and capital budgets, preparation to take over customer services and billing and other financial management functions, preparing to manage federal funding, increasing emergency response preparedness, and assessing the chain of supply for fuel and power."

The Marrero Declaration also noted present benefits to PREPA from the front-end transition services that would actualize before the full transition of control over PREPA's T&D System. These benefits include "(i) locating inefficiencies in the T&D System; (ii) identifying and implementing non-personnel related cost-saving measures; (iii) preparing for management of federal funding; (iv) assessing and beginning to improve the chain of supply for fuel and power; and (v) supporting privatization efforts regarding PREPA's generation assets."

Appellants' arguments as to the Title III court's application of § 503(b)(1)(A) also fail. Contrary to appellants' assertions, the Title III court recognized that the burden was on the government parties to show that the payments at issue qualified for an administrative expense priority. It found that they had "satisfied

their burden" through the Marrero Declaration, which "provided evidence of their determination that numerous aspects of the Front-End Transition Services will inure to PREPA's benefit." Administrative Expense Order, 621 B.R. at 301, 303.

The Title III court did not abuse its discretion in finding that appellees satisfied their burden under 11 U.S.C. § 503(b)(1)(A). PREPA filed for bankruptcy in 2017 after decades of operational and financial challenges that resulted in inefficient, expensive power service and serious electric power failures in Puerto Rico. The Title III court did not err in according administrative expense priority to PREPA's payments for the front-end transition services.

C. The Title III Court Correctly Held That 48 U.S.C. § 2126(e) Prevents it from Reviewing Challenges to FOMB's Certification Decision.

Appellants also argue that granting administrative expense priority status to the front-end transition service costs contravenes 48 U.S.C. § 2141(b)(1). The Title III court held that § 2126(e) prevents judicial review of appellants' challenges under § 2141(b)(1). Administrative Expense Order, 621 B.R. at 303 n.12.

We agree. Section 2141(b)(1) lists requirements for fiscal plans developed under PROMESA. The requirements include "ensur[ing] the funding of essential public services" and "provid[ing] adequate funding for public pension systems." 48 U.S.C. §§ 2141(b)(1)(B), (C). Section 2141(c)(3) further states

- 16 -

that FOMB shall review any fiscal plan for compliance with the § 2141(b)(1) requirements and has "sole discretion" to determine whether to certify a fiscal plan or budget as compliant with those requirements. Id. § 2141(c)(3). PROMESA insulates FOMB's certification determinations from judicial review in the federal courts. Id. § 2126(e) ("There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter."); In re Fin. Oversight & Mgmt. Bd. for P.R. (Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 112 (1st Cir. 2019).

FOMB certified the PREPA 2020 fiscal plan in June 2020, which included a $132 million deficit in 2021 to account for the Front-End Transition Service Fee to LUMA under the T&D Contract. Under the terms of the T&D Contract, PREPA agreed to seek administrative expense treatment for the front-end transition service costs, and LUMA may terminate the contract if administrative expense treatment is not granted. As such, appellants' § 2141(b) challenge is nothing more than a challenge to PREPA's inclusion of the Front-End Transition Service Fee in its fiscal plan and FOMB's certification of that plan. The Title III court correctly held that § 2126(e) insulates these certification decisions from judicial review.

Finally, appellants' argument that the Title III court's interpretation of 48 U.S.C. § 2126(e) violates the nondelegation

- 17 -

doctrine is waived because they never raised the issue before the Title III court, and no exceptional circumstances warrant consideration of this argument for the first time on appeal.  See United States v. Rodrigues, 850 F.3d 1, 13 n.6 (1st Cir. 2017).

### III. Conclusion

The judgment of the district court is affirmed.  Costs are awarded to appellees.